833 So.2d 1216 (2002)
Stacey Laverne MARTIN, Plaintiff-Appellee,
v.
Tara Wyatt MARTIN, Defendant-Appellant.
No. 36,860-CA.
Court of Appeal of Louisiana, Second Circuit.
December 11, 2002.
*1218 Albert E. Loomis, III, Monroe, for Appellant.
Richard L. Fewell, Jr., West Monroe, for Appellee.
Before BROWN, CARAWAY and HARRISON (Pro Tempore), JJ.
CARAWAY, J.
The trial court decided this child custody dispute in favor of the father, who resides in Louisiana, and awarded extended summertime visitation to the mother, who resides with her new spouse in Maine. The mother appeals the ruling, seeking primary custody of the five-year-old child during the school year in Maine. Amending the judgment to provide for joint custody and for the designation of the domicilary parent, we otherwise affirm the trial court's ruling.

Facts
Tara Darville (formerly known as Tara Wyatt Martin) (hereafter "Tara") and Stacey LaVerne Martin (hereafter "Stacey") married in 1993 and established their matrimonial domicile in Morehouse Parish. During the marriage, Stacey worked as a manager for Wal-Mart and Tara obtained an associate degree in nursing. She began working as a registered nurse in 1998. Their only child, Luke, was born on April 24, 1997. A second child, Tyler, was born on March 30, 1999. Although Stacey thought he was also the father of this child, he subsequently learned that Tara's present husband, Scott Darville ("Scott"), was Tyler's biological father. Tara "met" Scott on the internet. Scott has always resided in Maine.
Tara alleged that Stacey abused her while they were married. During the custody trial, she testified to Stacey's verbal and physical abuse. She stated that the last incident, in which Stacey pushed her down on the ground two weeks before she left, precipitated her departure from the matrimonial domicile. On October 14, 1999, she drove to Maine with the two children and Scott, who had flown to Louisiana to accompany her on the trip. She stayed in Maine, living with and marrying Scott shortly after she and Stacey were divorced in October 2000. Although she evidently instituted proceedings in Maine under the Uniform Child Custody Jurisdiction Act,[1] she eventually agreed that Louisiana would have jurisdiction over the issue of Luke's custody.
Tara briefly returned from Maine with the children for the first time during Christmas of 1999. When Stacey went to Tara's parents' house to see the children, a fight erupted between Stacey and Scott. The police arrested Stacey for assault. Later that evening, Scott, Tara and the children headed back to Maine. Luke did not return to Louisiana until fourteen months later, in February 2001.
Stacey traveled to Maine in mid-February, 2001. As a result of legal proceedings over custody in Louisiana and Maine, the parties and their respective counsel negotiated an agreement acknowledging that DNA testing had proven that Scott fathered the younger child, Tyler.[2] They further agreed to interim joint legal custody of Luke, and that "the physical and primary residential custody of Luke shall be with the plaintiff, Stacey L. Martin," in Louisiana. Finally, the agreement set up a visitation schedule which provided that Tara would have overnight visitation on Tuesday and Thursday nights, and alternating *1219 weekends. All such visitation was to occur in Louisiana.
Two weeks after Stacey and Luke returned to Louisiana, Tara began living in Bastrop with her family to exercise visitation with Luke. This custodial arrangement continued for two months, until Stacey learned that Tara was asserting her right to permanent custody and "disallowed" her visitation. She testified that she did not exercise any further visitation with Luke until August 2001, four months later.
After Luke returned to Louisiana in February, Stacey remarried. Stacey began working at the Springhill Wal-Mart in December 2001 and commuted between Bastrop and Springhill until his family moved to Springhill in March. Testimony indicated that because of Stacey's working hours, his new wife, Amanda, primarily cared for Luke and the couple's new son.
After the trial began in October 2001, but before its conclusion in May 2002, Amanda allegedly disciplined Luke by whipping him with a belt. One incident occurred in February, when Amanda punished Luke with a belt after he urinated in his bedroom. Tara saw the bruises on his legs and reported the incident to the police. The police report stated that according to Amanda, Luke's father worked long hours and Luke was constantly in her care. Luke told Tara that he was afraid to leave his room because of Amanda. A psychologist conducted a single interview with Luke. His report concluded that Luke was concerned about being hurt, and recommended that Luke's biological parents, not his step-parent, discipline him. He also recommended that "the use of corporal punishment be reassessed as Luke is feeling abused," and concluded that Luke needed a greater degree of security and the use of more appropriate disciplinary techniques.
In October 2001, on the second day of trial, the court lengthened Tara's visitation with Luke in Bastrop to every other week. This arrangement continued for five months, until Stacey moved his family to Springhill. That month, the trial court heard more testimony and again modified the interim custody order, "dividing visitation in half."
After a delay until May 2002, the trial continued. The evidence indicated that Tara would return to live with her husband and Tyler in Maine following the resolution of Luke's custody. She testified that Luke had enjoyed living in Maine with his brother and step-father. Scott owned a home in Maine and was employed in a family business. Therefore, Tara had no plans to return to work as a nurse in Maine.
At the close of trial, the trial court had a lengthy discussion with counsel reflecting on the evidence and issues. The court vacillated in its assessment of the parties, at one point expressing its "inclination" as "to grant Mr. Martin primary domiciliary custody." Later, the court stated that "if Mrs. Darville was living across town rather than at the other end of the country, probably I would be leaning in favor of her." Because of Stacey's work schedule, "she would be more of a primary caregiver to the child than he would be." The trial court took the matter under advisement, but did not render written reasons for judgment.
On July 2, 2002, the court issued the following order ("Order"):

ORDER
The Court awards the custody of the minor child of the marriage at issue herein to Mr. Stacey LaVerne Martin. Mrs. Martin (now Darville) shall enjoy reasonable visitation rights including the *1220 right to physical custody of the child on alternating major holidays and major summertime visitation.
Within TWENTY-FIVE (25) days of the date of this Order, the parties shall jointly submit a Custody Plan/Visitation Order which will comply with the broad parameters of this Order but which will specify in more detail the particulars of the Custody Scheme.
If the parties are unable to agree on a Custody Plan/Visitation Order in conformity with this Order, the Parties each shall submit his own proposed Custody Plan/Visitation Order no later than THIRTY (30) days after the date of this Order and the Court shall choose either one of the submitted plans for (sic) devise one of its own.
It is from this Order that Tara appeals.

Discussion
There are two preliminary issues which we will address before consideration of the trial court's custody ruling. First, Stacey argues that the trial court's Order was not a final appealable judgment because the court did not specify the sharing arrangement for the "Custody Plan/Visitation Order" contemplated in the trial court's Order. Additionally, Stacey argues that other issues pertaining to Tara's delinquent child support obligation and contempt of court proceedings remain. While we agree that the trial court's resolution of this custody dispute should have specified the details of the sharing arrangement and concluded the dispute, obviating potential disagreement between the parties, we consider the Order final concerning the award of custody as discussed further below. Additionally, La. C.C.P. art. 3943 indicates that an appeal lies immediately from a judgment awarding custody within the special thirty-day appeal period, and any other pending matter in the family proceeding does not affect the finality of the custody ruling.
Second, Tara made allegations of abuse and prayed for relief under the Post-Separation Family Violence Relief Act, La. R.S. 9:361, et seq. (the "Act"). She continues to argue that Stacey's actions toward her are factors for consideration under Civil Code Article 134 for the award of custody. However, she makes no argument that the Act applies.
In her testimony, Tara described a volatile relationship; yet most of the incidences she described occurred before the parties were married in 1993 or before the birth of Luke in 1997. After one incident before Luke's birth, she showed bruises on her legs to her parents. Her parents corroborated this in their testimony at trial. Tara reported that after Luke's birth, on three occasions, Stacey pushed her or verbally abused her. The final act which she reported occurred two weeks before she left the marital domicile and moved to Maine in October 1999.
The most significant incident of violence occurred in December 1999 when Tara returned to her parents' home with the two children and Scott. Stacey came to the home to see Luke and shortly after his arrival, he got into a fight with Scott. The two witnesses to the fight, Tara and her mother, were not immediately present in the room when the fight broke out. Therefore, the details of the provocation of the fight were never given. Scott did not testify at trial, and Stacey was never asked about the incident. The circumstantial evidence indicates, however, that Stacey was the aggressor in the fight since Scott was seated holding the baby, Tyler, when the fight erupted. In discussing the incident at the close of the trial, the trial court concluded that Stacey "suddenly and without immediate provocation attacked Mr. Darville."
*1221 Regardless of the appellant's failure to specifically argue the provisions of the Act, its significant social concern and high standard of review should not be ignored by a court after receiving evidence of violence. La. R.S. 9:364(A) provides a legal standard which must be applied in a custody case involving violence. It provides, in pertinent part, as follows:
There is created a presumption that no parent who has a history of perpetrating family violence shall be awarded sole or joint custody of children. The court may find a history of perpetrating family violence if the court finds that one incident of family violence has resulted in serious bodily injury or the court finds more than one incident of family violence.
It is clear from the discussion of the custody dispute at the close of trial that the trial court did not apply the presumption of the Act against Stacey. The court apparently concluded that Stacey's fight with Scott was a one-time incident that did not result in serious bodily injury. The trial court also could conclude that Tara's testimony regarding Stacey's prior acts before Luke's birth did not demonstrate a significant history of family violence. The corroborating testimony of Tara's parents concerning the bruises Tara suffered did not reflect that they considered that serious violent acts indeed occurred. Finally, credibility issues pertaining to Tara, as discussed below, allowed the trial court to discount her claim for a history of family violence. Based upon our review of the record, we find the presumption of the Act inapplicable for the ruling regarding custody in this proceeding.

Sole or Joint Custody
Tara's first assignment of error is that the trial court improperly granted sole custody of Luke to Stacey. La. C.C. art. 132 provides in pertinent part as follows:
In the absence of an agreement, or if the agreement is not in the best interest of the child, the court shall award custody to the parents jointly; however, if custody in one parent is shown by clear and convincing evidence to serve the best interest of the child, the court shall award custody to that parent.
Pursuant to Art. 132, Stacey's burden was to prove by clear and convincing evidence that sole custody, as opposed to joint custody, is in the best interest of the child. In order to prove a matter by "clear and convincing evidence," a party must demonstrate that the existence of a disputed factin this instance, that sole custody is preferableis highly probable or much more than its nonexistence. Washkow v. Washkow, 33,965 (La.App. 2 Cir. 8/23/00), 765 So.2d 1210; Harper v. Harper, 33,452 (La.App. 2 Cir. 6/21/00), 764 So.2d 1186.
Under our prior law, La. C.C. art. 131, before amendment in 1993, the presumption in favor of joint custody would cease to exist if a parent moved out of state. See, Deshotels v. Deshotels, 638 So.2d 1199 (La.App. 1st Cir.1994). Now, when considering the best interest of the child, "the distance between the respective residences of the parties" is one of many factors with regard to joint or sole custody and the implementation order for joint custody. La. C.C. art. 134(11).
In Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731, the court considered whether a stipulated joint custody arrangement should be modified to sole custody when one parent moved to Washington. The court determined that joint custody should continue, noting the "[r]emoval of a parent from Louisiana should not, of itself, constitute a sufficient reason to terminate the joint legal custody arrangement." Id. at 739.
*1222 As reflected in the lengthy discussion at the close of trial, the trial court was wrestling with the issue of which parent should be the domiciliary parent in a joint custody arrangement and have physical custody of the child for the school year. Nevertheless, the Order implies that sole custody was rendered in favor of Stacey. We do not find from the record that Stacey proved by clear and convincing evidence that he should be awarded sole custody of the child. Accordingly, we amend the judgment's lack of clarity on this issue and award joint custody.

Physical Custody and Domiciliary Parent
When joint custody is determined as applicable, La. R.S. 9:335 provides that an implementation order should set forth the sharing arrangement for physical custody and designate the domiciliary parent. "To the extent feasible and in the best interest of the child, physical custody of the children should be shared equally." La. R.S. 9:335(A)(2)(b). Distance between the parties inherently precludes an equal sharing of physical custody when the child is of school age. Templeton v. Templeton, 98-2503 (La.App. 1st Cir.4/1/99), 730 So.2d 1070.
In Evans v. Lungrin, supra, our supreme court maintained joint custody and determined that "transporting [the four-year-old] back and forth between the State of Washington and Louisiana for four-month intervals is not in her best interest." 708 So.2d at 740. Likewise, since Luke is now entering kindergarten, any feasible arrangement would require that one parent have physical custody during the school year due to the significant distance between the parties' homes. The Order basically provides the framework for a feasible arrangement by granting one parent physical custody during the school year and the other parent the "major summertime" physical custody. Pursuant to the cited statute, we must now determine if the trial court's choice of Stacey as the parent with physical custody during the school year was in the best interest of the child.
To determine the best interest of the child for a feasible sharing arrangement under La. R.S. 9:335(A)(2)(b), the court must weigh and balance those factors enumerated in La. C.C. art. 134, which provides:
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close *1223 and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
The trial court's determination of custody is entitled to great weight and will not be reversed on appeal unless an abuse of discretion is clearly shown. Thompson v. Thompson, 532 So.2d 101 (La.1988); Washkow, supra; Ramphrey v. Ramphrey, 32,560 (La.App.2d Cir.12/8/99), 749 So.2d 835; McKinley v. McKinley, 25,365 (La.App.2d Cir.1/19/94), 631 So.2d 45.
Tara emphasizes her primary role and responsibility for the prior care and rearing of Luke. She cites Stacey's lack of development of a strong emotional bond with Luke due to Stacey's long hours on the job at Wal-Mart and another part-time job he previously maintained. Luke was almost four years old when Stacey brought Luke back to Louisiana from Maine and, according to Tara, assumed parenting responsibility for Luke for the first time. Additionally, Tara emphasizes that prior to the parties' separation, the family unit included Tyler. Luke's relationship with Tyler continued unabated for almost the first two years of Tyler's life. During that time, Luke also developed a relationship with Scott, and the proposed custodial home in Maine established stability.
To Tara's assertions, Stacey responds that Luke was only two and one-half years old when Tara left for Maine. Tara had been either in school or employed throughout Luke's life prior to separation, and Stacey claims that he also contributed to caring for the child's needs. Stacey also insists that his promoted job status as store manager of the Springhill Wal-Mart allows him much more flexibility in his employment so that he will be able to devote more time to his son.
While the trial court did acknowledge the superiority of Tara's caregiver role in the past and for the future, the court nevertheless expressed concerns throughout the trial over Tara's abrupt and secretive flight to Maine with Scott and the children in October 1999. Stacey, Tara's parents, and Tara's employer were not immediately told that she moved to Maine. Some days passed before Stacey and her parents knew of her whereabouts. At that time, Stacey and her parents did not know of Tara's relationship with Scott. Tara admitted that during the prior six and one-half months since Tyler's birth in March 1999, she tried to prevent Stacey from becoming attached to Tyler, knowing that Tyler was Scott's child. Any close and continuing relationship that needed to be maintained between Luke and Stacey was thwarted for the sixteen months that Tara lived in Maine and pursued legal action in that state.
Tara's actions clearly allowed the trial court to suspect Tara's willingness and distrust her ability to facilitate and encourage a close and continuing relationship between Luke and Stacey. Only the trial court could weigh this credibility issue arising from Tara's past actions. The credibility issue also affects Tara's domestic abuse claim as causing the breakup of the family and the stable environment that she claimed in Maine.
Many of the other factors listed under Article 134 can be met by both parents, and the choice concerning which parent should serve as the primary custodian during the school year is very close. Accordingly, we cannot say that the trial court abused its discretion in awarding Stacey the physical custody of Luke during the school year. Additionally, the record also supports designating Stacey as the domiciliary *1224 parent, as the trial court gave no reason for omitting such designation.

Conclusion
We amend the judgment of the trial court as reflected in the Order of July 7, 2002, to provide for the parents' joint custody of Luke. We affirm the trial court's designation of Stacey as the primary custodian of Luke during the school year. We further amend the Order and designate Stacey as the domiciliary parent. Finally, we remand the case for the trial court's entry of an implementation order for the physical custody of the child consistent with our rulings herein and with the provisions contained in our unpublished attachment hereto, detailing the holiday and summertime scheduling, the travel expenses for the child, and the telephone access to the child. Costs of appeal are assessed equally to both parties.
AMENDED, AND AS AMENDED, AFFIRMED; CASE REMANDED.
NOTES
[1] La. R.S. 13:1700, et seq.
[2] After Scott adopted this child, his name was changed to Solon.