847 So.2d 157 (2003)
Michael WHITE, Plaintiff-Appellee,
v.
Tabitha KIMREY, Defendant-Appellant.
No. 37,408-CA.
Court of Appeal of Louisiana, Second Circuit.
May 14, 2003.
Rehearing Denied June 6, 2003.
*158 Chris L. Bowman, Jonesboro, for Appellant.
Layne M. Adams, Monroe, for Appellee.
Before BROWN, WILLIAMS, and CARAWAY, JJ.
BROWN, C.J.
The primary issue in this domestic dispute is whether the trial court erred in modifying its original custody order by awarding sole custody of the parties' five-year-old daughter to plaintiff, Michael White, after finding that defendant, Tabitha Kimrey, had intentionally undermined the father-daughter relationship, made relentless allegations of sexual abuse and denied Michael, on several occasions, his court-ordered visitation. While we find no manifest error in the trial court's factual determinations, which were the basis for his decision that a change of custody was warranted, we nonetheless conclude that joint custody, with Michael as the domiciliary parent, is warranted and amend the judgment accordingly.

Facts
Krista Paige Kimrey was born to the parties on August 26, 1997.[1] Because Tabitha was receiving AFDC (Aid for Families with Dependent Children), when Krista was approximately 18 months old, the State of Louisiana instituted child support proceedings against Michael. Thereafter, he filed a rule for joint custody on April 28, 1999.[2] Tabitha responded, alleging *159 that Michael had been physically violent and emotionally abusive toward her in the past and requesting that any visitation granted to Michael be supervised.
On May 28, 1999, the trial court entered an interim consent order in which the parties agreed to joint custody with Tabitha being designated as the domiciliary parent. Michael was allowed visits with Krista every other weekend, with a gradual increase in the length of the visits from two to eight hours.[3] He was also ordered to attend an anger management class[4] and the matter was scheduled for review on August 27, 1999. On that date, pursuant to stipulations entered into in open court, the parties entered into a consent agreement providing for joint custody with Tabitha designated as domiciliary parent. Provisions were made for Michael's visitations to gradually increase such that, at the end of the 17th visitation period, which was every other weekend, he would have weekend visitations beginning on Friday at 6:00 p.m. and ending on Sunday at 6:00 p.m.
Michael's first full weekend visitation was to begin on April 21, 2000. On that date, however, Tabitha told Michael that Krista was ill and took her to the emergency room on Friday evening.[5] The second full weekend visitation was to begin on May 5, 2000. Tabitha again denied Michael visitation because she did not want him taking Krista to Texas to visit his relatives. On June 14, 2000, Michael filed a rule to fix visitation and for contempt. The rule was heard on October 13 and 24, 2000. The trial court rendered judgment granting the parties joint custody, with Tabitha being designated as domiciliary parent.[6]
On January 25, 2001, Michael filed a rule for contempt based upon Tabitha's refusal to allow him visitation as provided for in the court's judgment.[7] Tabitha countered with a reconventional demand seeking sole custody.[8] On May 17, 2001, the trial court signed a consent order maintaining the judgment rendered on October 24, 2000, and continuing without date the rule for contempt and reconventional demand.[9]
On July 16, 2001, Tabitha filed a rule for contempt alleging nonpayment of child support and seeking an increase in Michael's *160 monthly obligation. Michael filed an exception, alleging that there was no valid child support order and that Tabitha failed to join a necessary party, the State of Louisiana. A supplemental and amended rule was filed, naming the state.
On March 28, 2002, Michael filed a rule for contempt and requesting sole custody of Krista, based upon Tabitha's failure to allow him visitation and her continued allegations of sexual abuse, all of which were investigated and found to be invalid by the sheriff's office and Child Protective Services.[10] Evidence was presented beginning May 28 and ending July 1, 2002.[11] On August 30, 2002, the trial court issued its written reasons for judgment and a judgment was filed on November 13, 2002, granting sole custody of Krista to Michael and specified visitation rights to Tabitha. The court further found Tabitha to be in contempt of court for violating the court's custody ruling and ordered her to pay $1,000 in attorney fees and all costs of the proceeding. Michael was also found to be in contempt for failure to timely pay court-ordered child support and was assessed with $350 in attorney fees. All other incidental demands raised by the pleadings were denied. It is from this judgment that Tabitha has appealed.

Discussion

Applicable Legal Principles
The burden of proof upon a party seeking to modify a prior permanent custody award is dependent on the nature of the original custody award. Custody awards are of two types. The first is a stipulated judgment, such as when the parties consent to a custodial arrangement. The second is a considered decree, which is rendered after the trial court has received evidence of parental fitness to exercise care, custody and control of a child. Evans v. Lungrin, 97-0541 (La.02/06/98), 708 So.2d 731; Shaffer v. Shaffer, 00-1251 (La.App. 1st Cir.09/13/00), 808 So.2d 354, writ denied, 00-2838 (La.11/13/00), 774 So.2d 151.
When the original custody decree is a stipulated judgment, the party seeking modification must prove that there has been a material change in circumstances since the original decree and that the proposed modification is in the best interest of the child. Evans, supra; Touchet v. Touchet, 36,881 (La.App.2d Cir.01/29/03), 836 So.2d 1149; Masters v. Masters, 33,438 (La.App.2d Cir.04/05/00), 756 So.2d 1196, writ denied, 01-3096 (La.12/07/01), 803 So.2d 975.
A party seeking to modify a considered decree of permanent custody bears a heavy burden of proving that the continuation of the present custody arrangement is so deleterious to the child as to justify a modification of the custody decree or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. Evans, supra; Bergeron v. Bergeron, 492 So.2d 1193 (La.1986); Evans v. Lites, 30,632 (La.App.2d Cir.06/24/98), 714 So.2d 914.
La.C.C. art. 132 provides in pertinent part:
In the absence of agreement, or if the agreement is not in the best interest of the child, the court shall award custody to the parents jointly; however, if custody in one parent is shown by clear and *161 convincing evidence to serve the best interest of the child, the court shall award custody to that parent.
Both parties requested that they be granted sole custody of Krista. Their burden pursuant to La.C.C. art. 132 was to prove by clear and convincing evidence that sole custody, as opposed to joint custody, was in the best interest of the child. In order to prove a matter by clear and convincing evidence, a party must demonstrate that the existence of a disputed fact, in this instance, that sole custody was preferable, is highly probable or much more probable than its nonexistence. Washkow v. Washkow, 33,965 (La.App.2d Cir.08/23/00), 765 So.2d 1210; Johnson v. Breck Construction Co., 32,311 (La.App.2d Cir.09/22/99), 743 So.2d 296.
La.C.C. art. 134 provides a non-exclusive list of factors which the trial court may consider with all other relevant factors for the determination of the best interest of the child.[12] An analysis of these factors should be made in actions to change custody as well as those to establish custody initially. La.C.C. art. 134, comment (d); Craft v. Craft, 35,785 (La.App.2d Cir.01/23/02), 805 So.2d 1213; Shaw v. Shaw, 30,613 (La.App.2d Cir.06/24/98), 714 So.2d 906, writs denied, 98-2414, 98-2426 (La.11/20/98), 729 So.2d 558.
When an award of joint custody is determined to be in the best interest of the child, equal sharing of physical custody is not necessarily required. Craft, supra; Nichols v. Nichols, 32,219 (La.App.2d Cir.09/22/99), 747 So.2d 120; O'Brien v. O'Brien, 30,001 (La.App.2d Cir.12/10/97), 704 So.2d 933. Substantial time rather than strict equality of time is mandated by the legislative scheme providing for joint custody of children. Craft, supra; Boyd v. Boyd, 26,292 (La.App.2d Cir.12/07/94), 647 So.2d 414. As noted by the court in Nichols, supra, joint custody does not necessarily mean a 50/50 sharing of time.
Instead, every child custody case is to be viewed on its own peculiar set of facts and the relationships involved, with the paramount goal of reaching a decision which is in the best interest of the child. Craft, supra; Nichols, supra. Each case will depend on the child's age, the parents' situations and other factors relevant to that particular custody dispute. Craft, supra; Brazan v. Brazan, 93-2369 (La.App. 1st Cir.06/24/94), 638 So.2d 1176.
*162 The trial court's determination regarding child custody is entitled to great weight and will not be disturbed on appeal absent a clear abuse of discretion. Craft, supra; Warlick v. Warlick, 27,389 (La. App.2d Cir.09/29/95), 661 So.2d 706.

Analysis
In attacking the trial court's judgment granting Michael sole custody, Tabitha first contends that the trial court applied the wrong standard in finding that Michael met his burden of proof that a change of custody was warranted. It is Tabitha's position that, in light of the fact that a considered decree had been rendered granting the parties joint custody, the applicable burden was as set forth in Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), i.e., that there had been a substantial change in circumstances since the previous ruling and that continuation of the current custody arrangement was so deleterious to the child such that a change in custody was justified. On the other hand, Michael contends that the heavy Bergeron burden did not apply because, contrary to Tabitha's assertion, the original custody decree was not a considered decree in which evidence of parental fitness was adduced. Instead, joint custody was agreed to by the parties in open court on August 28, 1999. Visitation was to be "worked out" and a joint custody plan was to be submitted. No judgment was ever signed because the parties were unable to work out a visitation schedule/joint custody plan. The rule heard on October 13 and 24, 2000, and therefore the evidence introduced thereto, did not concern custody, but was simply to establish visitation. Thus, the Bergeron standard is inapplicable.
We have reviewed the trial court's written reasons for judgment and find that, contrary to Tabitha's argument, the trial court did in fact apply the heavy burden set forth in Bergeron and found that Michael met the more onerous burden of proof required in cases in which evidence of parental fitness had been introduced. Particularly, in its written reasons for judgment, the trial court concluded:
... After careful thought, consideration and review, the court has determined that a substantial material change in circumstances has occurred.
... The continuation of the present custodial arrangement is so deleterious to the child as to justify a modification of the custody decree.
We find, however, that there was no previous considered decree. The initial custody order, which was to be an interim arrangement, was entered into by stipulation of the parties. Although the parties agreed to joint custody with Tabitha as the domiciliary parent, because they could not work out the details of Michael's visitation schedule, no judgment was signed effecting said agreement. Thereafter, the hearing that was held in October 2000, of which no transcript has been provided, was on Michael's rules for contempt and to establish visitation. Therefore, any evidence adduced at that hearing went to those issues, not the issue of parental fitness for custody. Notwithstanding our conclusion that the trial court erred in applying the higher Bergeron burden, we find that Michael introduced sufficient evidence that a change in custody was warranted.
The following is excerpted from the trial court's written findings:
This matter is the latest chapter in an unfortunate progression of litigation. The court has tried to set forth in detail the procedural history of this case in order to demonstrate the numerous difficulties and complications that have arisen regarding the minor child. The testimony of the parties, the supporting *163 witnesses and the evidence dictates the following conclusions.
After careful thought, consideration, and review the court has determined that a substantial material change in circumstances has occurred. Tabitha's ability to provide the more nurturing home for Krista has been tainted by her constant efforts to thwart the father-daughter relationship. She admitted that she told Michael that she would drop child support if he would sever his parental ties with Krista. The record and testimony shows that she has made repeated allegations of sexual abuse against Michael regarding Krista, none of which have ever been substantiated or validated. She has obviously deprived Michael of some of his court-ordered visitation. Furthermore, problems have ensued during the custody exchanges, including the time that Tabitha's father called Michael a child molester.
In the present case, Dr. E.H. Baker, a Louisiana psychologist, testified on behalf of the Whites. He testified that he had interviewed the Whites and the child as well as reviewing the reports of Dr. Susan B. Vigen and Dr. Sally Thigpen. He opined that the mother was trying to prevent the father's access to the child. Dr. Baker further testified in effect that the mother was programming the child to be negative as regards the father. He diagnosed the situation as parental alienation syndrome, which is harmful to the child. He further related that the accepted method of treatment for parental alienation syndrome is to give the child to the parent not causing the alienation. However, he does believe that the child should have contact with her mother.
The evidence clearly demonstrates that the mother's reported conduct is indicative that her behavioral control has deteriorated since the inception of this lawsuit. The court shares Dr. Baker's concern that if the child remains with the mother on a continuous basis that she would be at risk of developing even more serious emotional problems because of her expressions and comments towards her father. The court is convinced that the mother is deeply troubled and that her emotional and mental state has (sic) contributed to her inability to control her behavior in a more acceptable manner. Unfortunately, it is totally unrealistic to expect the mother to resolve her conflicts with Michael and completely refocus on the "best interests" of their daughter. Therefore, based on the evidence, it is the opinion of the court that Michael would facilitate and encourage a close and continuing relationship between Tabitha and Krista, whereas Tabitha would continue to thwart the father-daughter relationship.
The factors concerning the length of time the child has lived in a stable, adequate environment, the desirability of maintaining continuity of that environment and the permanence, as a family unit, of the existing or proposed custodial home also weigh in Michael's favor. Tabitha has been what the court terms Krista's primary caretaker since birth. However, she is twenty-five years of age and, although she has attained her GED, remains unemployed, still resides with her parents, and has food stamps and child support as her only visible means of support. Again, because of the unwillingness and inability of Tabitha and her mother to get along with Michael in an acceptable manner, Krista would most certainly be the recipient of further serious emotional and mental instability if maintained in the domiciliary custody of her mother. On the other hand, Michael has a close relationship with his wife *164 and family, has secured gainful employment in Bastrop, Texas, and is able and willing to provide an appropriate home for his minor daughter. Consequently, Michael is better able to supply his daughter's material needs and provide a stable living environment with the support of his family.[13]
The factor concerning the moral fitness of each party, insofar as it affects the welfare of the child, also weighs in Michael's favor. The court is absolutely horrified at the statements that have been made by Tabitha and her mother concerning Michael in the presence of this young child. Additionally, the court is convinced that Tabitha has talked to Krista concerning the unsubstantiated allegations of sexual abuse.
The continuation of the present custodial arrangement is so deleterious to the child as to justify a modification of the custody decree....
Based upon the tumultuous history of this case, it is obvious that the court has endeavored to give the mother an opportunity to demonstrate that she could and would refocus on the "best interests" of her daughter. Despite the court's past lectures and warnings, the mother's behavior has progressively worsened, whereas Michael has made serious attempts to comply with the court's orders.[14] The mother gave up a child for adoption although the reasons are unclear. The court strongly suspects but in reality can only guess as to whether this has increased her emotional and mental instability as regards Krista. But, the court is absolutely convinced that Tabitha desperately needs mental health counseling to address her problems.
Having reviewed the record in its entirety, we find ample support for the trial court's determination that a change of custody was warranted. We disagree, however, that Michael established by clear and convincing evidence that an award of sole custody would be in the best interest of the child and will amend the judgment to provide for joint custody, with Michael designated as domiciliary parent.[15] Given *165 the distance between the parties' residences, but primarily because of Tabitha's attitude and conduct and their detrimental effect upon Krista, Tabitha's continuing suspicions despite any evidence in support thereof, and her intentional disregard of previous court orders, we are very concerned with the trial court's decision to award Tabitha with visitation every other weekend. Michael, however, neither filed an appeal nor answered Tabitha's appeal. In light of the facts of this case, telephonic visitation as awarded by this court in Martin v. Martin, 36,860 (La.App.2d Cir.12/11/02), 833 So.2d 1216, certainly seems more appropriate.

Conclusion
For the reasons set forth above, the judgment of the trial court is AMENDED in the following respects:
(1) Joint custody of Krista is awarded to Michael White and Tabitha Kimrey.
(2) Michael White is designated as the domiciliary parent.
In all other respects, the judgment of the trial court is AFFIRMED.

APPLICATION FOR REHEARING
Before BROWN, C.J., WILLIAMS, CARAWAY, KOSTELKA, and DREW, JJ.
Rehearing denied.
NOTES
[1] Tabitha and Michael never married and were not living together at the time of Krista's birth.
[2] Michael saw Krista until she was approximately five months old but, because Tabitha and her parents made him "very, very uncomfortable," and wouldn't let him leave their home with the baby, he stopped visiting with Krista at that time.
[3] Tabitha was given the option to supervise these visits.
[4] The record contains a certificate dated August 21, 1999, indicating Michael's completion of the anger management class as ordered.
[5] The medical records indicate that Krista had been sick for several days when her mother brought her to the emergency room.
[6] Judgment was rendered in open court on October 24, 2000, but was not signed until February 26, 2001.
[7] In his rule, Michael alleged that he exercised his visitation the weekend of November 3, 2000. At the exchange, which took place at the Morehouse Parish Sheriff's Office, Krista's maternal grandfather called Michael a "child molester." Several hours after his next scheduled visitation, which was Thanksgiving, Tabitha took the child to the emergency room and made allegations of child abuse against Michael. These allegations were investigated and found to be invalid by both the Morehouse Parish Sheriff's Office and Child Protective Services before Christmas 2000. Tabitha, however, continued to deny Michael any contact or visitation with Krista.
[8] Continuing to allege sexual and physical abuse, Tabitha sought to limit Michael's contact with Krista to supervised visitation.
[9] This order also included the requirement that both Tabitha and Michael participate in counseling at the University of Louisiana in Monroe's Marriage and Family Therapy Clinic.
[10] After one such allegation, fearing that her mother's actions were harmful to the child, Michael took her to psychologist E.H. Baker for an evaluation.
[11] The record was left open so that the deposition of Suzanne Craig, a counselor, could be taken and filed. The deposition was filed on August 12, 2002.
[12] The factors enumerated in article 134 are:

(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
[13] The trial court, while presented with evidence of the love, affection and emotional ties between Krista and Tabitha and her parents, as well as their ability to provide the child with food, clothing, medical care and other material needs, obviously concluded that the animosity and hard feelings on the part of Tabitha and her parents toward Michael created an environment of instability and hostility that was detrimental to the child's well being. With this conclusion we must agree.
[14] We find troubling, however, Michael's failure to pay court-ordered child support for a nine-month period. We recognize that he was unemployed and note his payment in full of this past-due obligation as soon as he secured gainful employment, but cannot, as did the trial court, make the conclusion that he has seriously complied with all of the court's orders in light of this fact. On the other hand, he has respected the court's custody rulings, something we cannot say about Tabitha.
[15] It would be an understatement to say that there is animosity between these parents. As guidance for the parties, we will quote the supreme court's definition of "joint custody:"

The term "custody" is usually broken down into two components: physical or "actual" custody and legal custody. The typical joint custody plan will allocate time periods for physical custody between parents so as to promote a sharing of the care and custody of the child in such a way as to ensure the child frequent and continuing contact with both parents. Legal custody, by contrast, has previously been defined as "the right or authority of a parent or parents, to make decisions concerning the child's upbringing." Pursuant to this definition, both parents remained legal custodians of the child regardless of which parent had physical custody of the child at a given time under the typical joint custody plan. Joint legal custody thus involved a sharing of the responsibilities concerning the child including decisions about education, medical care, discipline and other matters relating to the upbringing of the child. Evans v. Lungrin, supra at 737 (citations omitted).