PATRICIA RIVET MURRAY, Judge.
 

 _U?his is a child custody and visitation dispute between two mothers — a biological
 
 *750
 
 mother, June Mire; and an adoptive mother, Angela Palazzolo — of an eleven year old girl, I.P.
 
 [1]
 
 For twenty-four years, Ms. Mire and Ms. Palazzolo were lesbian partners. During that time, they jointly decided to have a child by artificial insemination. The child, I.P., was born in 1997. For more than six years, the trio lived together as a family, first in California and then in Louisiana. When the relationship between Ms. Mire and Ms. Palazzolo ended, a dispute arose between them over custody and visitation. This suit followed. Following a lengthy trial, judgment was rendered awarding Ms. Mire sole custody and terminating Ms. Palazzolo’s visitation rights. From that judgment, Ms. Palazzo-lo appeals. For the reasons that follow, we affirm the trial court’s custody award, reverse the trial court’s visitation ruling, and remand for a hearing to set the parameters of visitation.
 

 FACTUAL AND PROCEDURAL BACKGROUND
 

 In the spring of 1979, Ms. Mire and Ms. Palazzolo commenced a lesbian relationship. In the summer of 1979, they began sharing an apartment. Both Ms. |2Mire and Ms. Palazzolo graduated from college while living in New Orleans. Ms. Mire obtained a bachelors degree in elementary education and a masters degree in biological science. Ms. Palazzolo obtained two bachelors degrees: mechanical engineering and business management. Thereafter, they moved to California and bought a house together. While living in California, Ms. Mire attended the University of Berk-ley and received a Ph.D. in zoology.
 

 After living together for about seventeen years, they decided to have a child by artificial insemination. They mutually agreed on the selection of the sperm donor. They also mutually agreed that the child, if male, would carry the Mire surname and that the child, if female, would carry the Palazzolo surname. Although Ms. Palazzolo attempted impregnation first, she was unsuccessful. Ms. Mire then attempted insemination and became pregnant in 1996.
 

 On January 25, 1997, Ms. Mire gave birth to I.P. Ms. Palazzolo was present for her birth.
 

 On March 14, 1997, Ms. Palazzolo, with Ms. Mire’s written consent, filed a petition for a second parent adoption in a California court. In the adoption petition, Ms. Palazzolo declared the following:
 

 • Ms. Mire’s decision to conceive and bear I.P. was made jointly by Ms. Palazzolo and Ms. Mire. They have acted in all respects as equal parents to I.P. since the child’s birth. They reside in the same home, which they own jointly, in Oakland, County of Alameda. They have resided together for over seventeen years and have known each other for over eighteen years.
 

 • They share the responsibility for the care as well as the economic support of I.P., and will continue to do so after this adoption. Ms. Palazzolo acts in all respects as a parent to the minor child.
 

 • Ms. Mire consents to this adoption and believes that it is in the child’s best interests that Ms. Palazzolo’s
 
 de facto
 
 parent relationship with the child be confirmed by judicial decree.
 

 |a* Ms. Mire intends that this adoption shall not alter her legal relationship to I.P., and that by this adoption I.P. shall have two legal parents: Ms. Palazzolo and Ms. Mire.
 

 
 *751
 
 • The natural father (sperm donor) consented to the termination of his parental rights.
 

 In answering questions in connection with the adoption, Ms. Mire declared as follows:
 

 • Ms. Palazzolo and Ms. Mire planned this child together and consider themselves to both be her parents. The adoption will provide legal protection to I.P. and recognition that Ms. Palaz-zolo is in fact her parent.
 

 • Ms. Palazzolo and Ms. Mire have jointly cared for I.P. since before her birth.
 

 On October 31, 1997, the California court approved the second parent adoption. Pursuant to California law the natural father’s (sperm donor’s) parental rights were terminated, Ms. Palazzolo was decreed a second parent, and Ms. Mire’s legal relationship with the child was unaltered. On January 9, 1998, an amended birth certificate was issued listing I.P.’s mother as Ms. Mire and her father as Ms. Palazzolo.
 

 In 1998, when I.P. was almost two years old, the trio relocated to Louisiana. Ms. Mire and Ms. Palazzolo purchased a house together in Lakeview, and they continued to cohabitate and co-parent. Until I.P. was three and began pre-school, Ms. Pa-lazzolo, who was then unemployed, stayed home and assisted in caring for I.P. From 1999 to 2002 (from when I.P. was two or three to when she was five years old), I.P. attended University Montessori School (“UMS”). Both Ms. Palazzolo and Ms. Mire transported I.P. to or from UMS and participated in school activities.
 

 |4On November 1, 2001 (when I.P. was four years old), Ms. Mire executed a will in which she left her entire estate to Ms. Palazzolo. The will included a provision that in the event the State of California reversed Ms. Palazzolo’s adoption of I.P., Ms. Palazzolo was to be named as I.P.’s permanent legal guardian. In the will, Ms. Mire also recognized Ms. Palazzolo as one of the “most important figures” in I.P.’s life.
 

 Beginning in 2002 (when I.P. was five years old), Ms. Mire began home schooling I.P. Both Ms. Mire and Ms. Palazzolo agreed that home schooling was appropriate for I.P. who was above average intelligence. They also agreed that Ms. Mire, who has an undergraduate degree in elementary education, a master degree in biological science, and a Ph.D. in zoology, was well qualified to teach I.P. Ms. Mire arranged with her employer to work at home in order to facilitate home schooling I.P.
 

 For about eight months spanning 2003 to 2004, Ms. Palazzolo worked in California and commuted back and forth to the family home in Louisiana. During this period, the relationship between Ms. Mire and Ms. Palazzolo deteriorated. Before then, they had a relationship without overt conflict. According to Ms. Palazzolo, the cause of the breakup of their relationship was Ms. Mire having a lesbian relationship with a married woman, Cathie Posin. Ms. Mire, on the other hand, characterized her relationship with Mrs. Posin as a platonic friendship and attributed the breakup to other causes.
 

 IfiDuring 2004, Ms. Palazzolo returned to work in New Orleans, and the parties separated. In the fall of 2004, Ms. Mire moved into an apartment located not far from the family home. For approximately one year (from fall 2004 to fall 2005), the parties co-parented I.P. and equally shared physical custody. During this time, Ms. Mire and Ms. Palazzolo jointly saw a counselor, Dr. James O’Neill, regarding their relationship.
 
 [2]
 

 
 *752
 
 In the Ml of 2005, Ms. Mire moved back into the family home. According to Ms. Mire, she moved back in order to make the shared custody arrangement less stressful for I.P. Ms. Mire indicated that her intent in moving back was for her and Ms. Palaz-zolo to be roommates. The attempt to live together in the family home, however, resulted in increased hostility between Ms. Mire and Ms. Palazzolo.
 

 On August 9, 2005, Ms. Mire moved herself and I.P. out of the family home. She, along with I.P., moved to a new house that she had just purchased in Jefferson Parish. Ms. Mire did not inform Ms. Pa-lazzolo of the move until after the fact leaving a phone message for her that day.
 

 On August 11, 2005, Ms. Palazzolo filed a petition for custody, child support, and use of the family home and asked for an expedited hearing. Through amended petitions she requested sole custody of the minor child or in the alternative joint custody with her designated as the primary domiciliary parent. She also requested in-junctive relief prohibiting Ms. Mire from removing the child from the jurisdiction of the court.
 

 IftOn August 29, 2005, before the court could rule on Ms. Palazzolo’s request for injunctive relief, Hurricane Katrina struck the New Orleans area. Ms. Mire evacuated with I.P. first to family in Montpelier, Louisiana, and then to her brother’s house in Austin, Texas, where they stayed for about two months. The family home in Lakeview, which Ms. Mire and Ms. Palaz-zolo co-owned, was destroyed as a result of the flood that followed Hurricane Katrina and is no longer habitable.
 
 [3]
 

 On October 20, 2005, Ms. Palazzolo again amended her petition to allege that Ms. Mire was denying her access to the child and abusing her
 
 de facto
 
 sole custody; she averred:
 

 Defendant [Ms. Mire] has arbitrarily and unreasonably denied Petitioner communication with and access to the minor child since 9 August 2005 when Defendant surreptitiously removed the minor child from the family home. Since that time, Defendant has, on information and belief, abused her
 
 de facto
 
 sole custody of the minor child by publicizing false allegations of heinous conduct allegedly committed by Petitioner, conducting a deliberate and calculated campaign to impair the relationship between the child and Petitioner, relocating the minor child from the jurisdiction of the court and refusing to return her to Louisiana although the home which Defendant owns in Jefferson Parish, and where she was living with the child when this litigation commenced, was habitable.
 

 On June 8, 2005, Ms. Mire answered the petition and amended petitions. Therein she also requested sole custody or in the alternative joint custody with her designated as the primary domiciliary parent. She admitted that she left the family home, which she co-owned with Ms. Palazzolo, and took I.P. with her; however, she averred that she did so for good and legal cause. She identified three causes j7that justified her actions. First, Ms. Palazzolo allegedly refused, despite Ms. Mire’s request, to discontinue the following conduct Ms. Mire felt was inappropriate: watching I.P. undress, sitting in the bathroom watching I.P. bathe, requesting body massages from I.P., holding I.P.’s hands while lying in bed with I.P. in an objectionable manner, tickling I.P. against her will, and kissing I.P. on the lips. Ms. Mire alleged that “the minor child has begged not to
 
 *753
 
 have to see or speak to the plaintiff [Ms. Palazzolo], and has repeatedly asked that she not be left alone with the plaintiff.”
 

 The second cause for moving Ms. Mire identified was Ms. Palazzolo’s threat that if Ms. Mire did not give her $3,000, Ms. Mire would find her things on the lawn or at the dump. Ms. Palazzolo also allegedly threatened to move Ms. Mire’s things out of the house while she was on vacation. The final cause Ms. Mire articulated was Ms. Palazzolo imparting her intention of dire consequences to Ms. Mire directly and indirectly (through her sister, Catherine Lane).
 

 On November 18, 2005, the trial court, apparently prompted by Ms. Mire’s allegations of inappropriate conduct, ordered that Ms. Palazzolo have supervised visitation with I.P. In so doing, the court acknowledged that the ordered supervision was without prejudice and without a finding of any factual or legal basis for the supervision. On that same date, the court ordered, as requested by both parties, a custody evaluation.
 
 [4]
 
 Brian T. Jordan, Ph.D. (“Dr. Jordan”) was |sappointed by the court as the custody evaluator for the purpose of making recommendations regarding custody and visitation that would be in the child’s best interest. Steven J. York, Ph.D. (“Dr. York”) was appointed as the minor child’s psychologist and to make recommendations regarding the child’s education and whether visitation with Ms. Palazzolo should continue.
 

 By letter to the court dated December 14, 2005, Dr. Jordan advised the court that he found no grounds to support allegations that Ms. Palazzolo had “engaged in sex abuse of her adopted daughter.” Dr. Jordan opined as follows:
 

 [B]oth she [Ms. Palazzolo] and the birth mother, Dr. June Mire, agreed on most of the child rearing of [I.P.], in the past. I find that they both engage in a variety of both positive and negative parenting techniques. [I.P.] has been raised in a very permissive home environment, which has produced both adultification and dependency. Her current alienation towards her adoptive mother stems in part from alienation tactics employed by [Ms.] Mire. The problems in their adult relationship have had a direct effect on [I.P.]
 

 Based on the above, Dr. Jordan recommended that Ms. Mire be named the domiciliary parent and have I.P. the majority of the time and that Ms. Palazzolo have visitation every other weekend and half of the major holidays. He further recommended that Dr. York continue to see I.P. and both parents for family therapy. Dr. Jordan suggested that this custody arrangement remain in place for six months and that he would make his final recommendations for permanent custody at that time. Although not requested to give an opinion on the issue of whether I.P. should continue to be home schooled, Dr. Jordan opined it would be in LP.’s best interest for her to attend school for socialization purposes.
 

 On the next day, December 15, 2005, the trial court issued an interim order, which provided the following:
 

 Is* The parties are to share interim joint custody and shall be co-domiciliary parents with equal access to the child pending further order from the court.
 

 • The party whose time period of physical custody is about to commence shall be responsible for timely picking up
 
 *754
 
 the child at the home of the other party unless the parties agree to another location.
 

 • Neither party shall in any way interfere with the other’s access to or time with the minor child, including but not limited to, following or surveilling the other party when she has physical custody, or the child when she is with the other party.
 

 • Each party shall allow the child to speak to the other party by telephone once daily at a reasonable time and for a reasonable duration.
 

 • Neither party shall discuss this litigation or denigrate the other party within the hearing of the child.
 

 • Ms. Mire shall send adequate and appropriate clothing with the minor child until further order of this Court.
 

 On December 27, 2005, Ms. Palazzolo filed a motion seeking a rule to show cause why I.P., then eight years old, should not be enrolled in regular school. As noted above, Ms. Mire began home schooling I.P. in 2002 (when I.P. was five years old). Dr. Jordan agreed that for socialization purposes I.P. should begin attending school, and Dr. York concurred. Dr. York further opined that I.P. should be in a school program that could meet her advanced academic needs. Given the opinions of the mental health professionals, Ms. Mire agreed that I.P. should attend school rendering Ms. Palazzolo’s motion moot. However, the parties disputed the particular school. Ms. Palazzolo wanted I.P. to attend a public school, Metairie Academy; and Ms. Mire wanted I.P. to attend a Christian school, St. Martin’s Episcopal School, where I.P. had attended summer camp. Following a hearing on the issue, the trial court ordered that I.P. attend school at St. Martin’s commencing in January 2006, and that Ms. Mire be responsible for all tuition and school related expenses.
 

 |inOn February 8, 2006, Ms. Mire filed a reconventional demand seeking to set aside Ms. Palazzolo’s second parent adoption of I.P. and to obtain a declaration that Ms. Mire is I.P.’s sole parent. Ms. Mire argued that the California adoption was invalid because an adoption by unmarried lesbian partners would not be allowed under Louisiana law. Louisiana law requires that couples seeking to adopt must be married and further defines marriage as between a man and a woman. Ms. Palaz-zolo responded by filing peremptory exceptions of no cause of action and res judicata arguing that the court must give full faith and credit to the California adoption.
 

 On March 8, 2006, Ms. Palazzolo filed a rule to show cause and for contempt based on Ms. Mire’s alleged violation of the court’s interim order, which provided that neither party shall in any way interfere with the other’s access to or time with the minor child, by engaging in the following conduct:
 

 • On December 15, 2005, when Ms. Mire dropped I.P. off at Ms. Palazzolo’s home, Ms. Mire, in the presence of I.P., verbally denigrated Ms. Palazzolo regarding her living conditions; forced I.P.’s dog, Peach, into Ms. Palazzolo’s car causing severe anxiety and distress for the child; and screamed at Ms. Palazzolo that she was “separating a child from her mother” and was a “monster” for doing so. Ms. Mire then allegedly instructed I.P. to call 911 in the event that Ms. Palazzolo touched or hurt her.
 

 • On February 13, 2006, Ms. Palazzolo arrived at St. Martin’s to pick I.P. up to bring her to a previously scheduled appointment with Dr. York. Ms. Mire showed up at the same time and physically attacked Ms. Palazzolo in front of I.P. Following this altercation, Ms. Mire followed Ms. Palazzolo and I.P.
 
 *755
 
 to Dr. York’s office and continued the harassment.
 

 • On Wednesday, March 1, 2006, Ms. Palazzolo had custody of I.P. and Ms. Mire was supposed to pick up I.P. at 6:00 p.m. In violation of the court’s order, Ms. Mire arrived at 5:00 p.m. and waited in front of Ms. Palazzolo’s house in her parked vehicle. This “predatory stalking” by Ms. Mire created undue stress for- I.P. during the final hours of her visitation with Ms. Palazzolo.
 

 |nBy stipulation read into the record on March 17, 2006, the parties agreed to the following: physical custody of I.P. with Ms. Palazzolo on alternating weekends; right of first refusal when the visitation schedule could not be strictly adhered to by either party; home studies of both parties’ residences; scheduling of doctor’s appointments after school except for emergencies; providing for phone contact with and by the minor child; ordering that both Ms. Palazzolo and Ms. Mire be listed as contact persons at I.P.’s school, enjoining either of the parties from removing LP.’s residence from the New Orleans area, and continuation of therapy with Dr. York.
 

 On May 1, 2006, Ms. Palazzolo filed a motion for contempt based not only on the allegations in the earlier motion for contempt, but also on the following additional allegations:
 

 • Ms. Mire violated the prior court order regarding telephone contact by failing to facilitate such contact when she has physical custody of I.P.
 

 • Ms. Mire failed to keep her informed of any medical conditions of I.P. and has kept the child home from school in violation of the court’s order that the child is to attend school unless a medical condition necessitates her staying home and seeing a doctor for treatment.
 

 • Ms. Mire has had and continues to have conversations 'with I.P. regarding the instant legal proceeding. These conversations with the minor child regarding the ongoing legal proceedings related to the child’s custody and Ms. Mire’s legal challenge to the adoption served to further alienate and isolate Ms. Palazzolo from her daughter and undermine Ms. Palazzolo’s parental authority and legitimacy in the eyes of her daughter.
 

 Based on these allegations, Ms. Palazzolo sought increased access to the child, especially during the upcoming summer vacation months so that she could enroll the child in summer camps.
 

 On May 2, 2006, the trial court sustained Ms. Palazzolo’s exceptions of no cause of action and res judicata and dismissed Ms. Mire’s reconventional demand | 12with prejudice. The trial court thus recognized the validity of Ms. Palazzolo’s California adoption of I.P. and gave the adoption full faith and credit.
 

 By letter to the court dated May 18, 2006, Dr. Jordan recommended to the court that the existing custody arrangement be continued for three more months and that the therapy with Dr. York likewise continue during that period. Continuing, Dr. Jordan indicated that his intent was to complete his final custody recommendation in September 2006- Dr. Jordan refused Ms. Palazzolo’s request to recommend increased summer visitation because of the high level of hostility between Ms. Palazzolo and I.P. .
 

 On May 19, 2006, Ms. Palazzolo filed an emergency motion for change of custody and supervised visitation with Ms. Mire. In this motion, she alleged that this change in the current custody plan was necessary given information suggesting that I.P. was being exposed to certain sexual improprie
 
 *756
 
 ties: Mrs. Posin and her sixteen year old son were living in Ms. Mire’s small house and Ms. Mire had pedophilia information on her computer to which I.P. might have access.
 

 On May 24, 2006, the trial court held a hearing on the motions. At this hearing, five witnesses testified: (1) Ms. Mire, (2) Dr. York, (3) Dr. Golden Richard (who was qualified as an expert in digital computer forensics and computer security), (4) Ms. Palazzolo, and (5) Mrs. Posin. Following the hearing, the trial court determined that “the preponderance of the evidence is that there is no lesbian relationship [between Ms. Mire and Mrs. Posin] constituting cohabitation.” The trial court thus concluded that there was not sufficient evidence to show a change of custody due to cohabitation or intimate sexual lesbian relationship between them. On that same date, the trial court rendered a judgment denying Ms. 113PaIazzolo’s requests for emergency change of custody, additional access to the minor child, and enrollment at summer camps.
 

 By letter addressed to the court dated August 16, 2006 Dr. Jordan, the court appointed psychologist/custody evaluator, recommended sole custody to Ms. Mire and that termination of visitation with Ms. Palazzolo was in the minor child’s best interest. Dr. Jordan cited four factors as supporting his recommendation: (i) Ms. Palazzolo’s second parent adoption of I.P. was not the “usual and customary” basis for adoption whereby the biological parents are unable or unwilling to raise the child; (ii) a child cannot have a maternal bond with two parents; (iii) I.P. does not want contact with Ms. Palazzolo; and (iv) the parties have clearly different ideas on raising I.P.
 

 On August 23, 2006, Ms. Mire, based on Dr. Jordan’s recommendation, filed a motion to terminate visitation pending the custody/visitation trial. On August 25, 2006, Ms. Palazzolo filed a motion to appoint Dr. Alicia Pellegrin as a second court-appointed evaluator. On October 3, 2006, the court granted the motion to appoint Dr. Pellegrin to conduct an additional custody evaluation on Ms. Palazzolo’s behalf, continued Ms. Mire’s motion to terminate visitation, and ordered that pending the ruling on that motion Ms. Palazzolo refrain from attending I.P.’s school or contacting any teachers or staff at the child’s school.
 

 On December 20, 2006, Dr. Pellegrin issued a report in which she made the following detailed recommendations:
 

 1. Because of the severe nature of parental alienation on the part of Ms. Mire, it is recommended that Ms. Palazzolo be granted domiciliary status and that I.P. reside with her primarily.
 

 2. Ms. Mire should have supervised visitation with I.P. in order to prevent continued alienating behavior. The supervisor should be someone other than Mrs. Posin and someone to whom both parties can agree.
 

 |u3. I.P. and Ms. Palazzolo should immediately begin a course of reconciliation therapy with a new therapist. Dr. Beverly Howze is recommended. In addition, it is recommended that Dr. Howze serve as LP.’s personal therapist. Whatever the Court ultimately decides, I.P. is a very confused child and is in need of a competent therapist to help her with her confusion and anger.
 

 4. Ms. Mire should enroll in a course of therapy to explore the consequences of her early trauma
 
 [5]
 
 and her diffi
 
 *757
 
 culties involving her relationships and sexuality, as well as her lack of emotional boundaries with I.P. Therapy should also be able to assist her in understanding the damaging and long lasting effects of parental alienation and guide her behavior accordingly.
 

 5. Ms. Palazzolo is in need of a program of anger management to prevent future inappropriate behavior when angered by Ms. Mire or any other situation.
 

 6. It is recommended that there be appointed a facilitator who can receive information from all therapists and that this person periodically review the matter in order to determine when unsupervised and increased visitation with Ms. Mire may begin.
 

 The trial court combined its consideration of Ms. Mire’ motion to terminate visitation with its consideration of the parties’ rules for custody. Evidence on both the custody and visitation issues was taken over the course of ten days, spanning from October 2006 to May 2007.
 
 [6]
 
 At trial, Ms. Mire and Ms. Palazzolo both testified regarding the underlying facts and procedural history set forth above. The trial judge on two separate occasions interviewed I.P. I.P. informed the judge of her preference to continue residing with Ms. Mire and to discontinue visiting Ms. Palazzolo. The following eight other witnesses also testified at trial: (i) Dr. Jordan; (ii) Dr. Pelleg-rin; (iii) Dr. Jeffery J. Lockman, who was qualified as an expert in |1sthe area of development psychology and child development; (iv) Stacey Byers, a summer intern for Ms. Mire; (v) Gail Williams, one of I.P.’s teacher at UMS; (vi) Stephanie Pittman, the head of the lower school at St. Martin’s in 2006; (vii) Michelle Mire, Ms. Mire’s sister; and (viii) Catherine Lane, another sister of Ms. Mire. Given the factually laden nature of the instant dispute, we find it necessary to outline the testimony of these eight other witnesses so as to provide a background for our analysis of the issues.
 

 (i) Dr. Jordan
 

 Dr. Jordan, the court-appointed psychologist/custody evaluator, was qualified as an expert in the field of clinical psychology. He characterized this case as a very unusual one because it involved two mothers. He acknowledged that he had not conducted any custody evaluations involving same sex couples. Dr. Jordan testified that he used the term adoptive mother to refer to Ms. Palazzolo solely to differentiate her from Ms. Mire, the biological mother. He further testified that he applied the same custody standards in this case as he applied in cases involving heterosexual parents.
 

 Dr. Jordan’s evaluation took place over a nine month period, beginning in November 2005 and ending in August 2006. Following his initial contact with the parties, Dr. Jordan referred them to Dr. York, a clinical psychologist, for therapy, and he con-
 
 *758
 
 suited with Dr. York in conducting his evaluation. Dr. Jordan issued two reports to the court: an initial report dated December 14, 2005, and a final report dated August 16, 2006. His testimony at trial was focused on those reports.
 

 Dr. Jordan translated the statement in his initial report that I.P. is a product of early adultification to mean that the parents had given her too much independence to make decisions beyond her age level. Dr. Jordan explained that |1(ihe omitted this statement from his final report because he did not believe it was a significant issue given the many changes in I.P. between December 2005 and August 2006. In December 2005, I.P. was being home-schooled and was overprotected. Until age six or seven (2003 or 2004), I.P. was raised by both parent figures in a very unusual environment — they all slept in the same bed, she never went to regular school, and she was given a lot of independence to express views beyond her age level. By August 2006, I.P. — at the recommendation of Drs. Jordan and York— was eni’olled in regular school. Dr. Jordan acknowledged his initial impression that I.P. might have trouble when she entered school forming social relationships was incorrect and that she was socializing very well. He also acknowledged that Ms. Mire had no problem letting go of I.P. for her to attend school.
 

 As to the issue of alienation, Dr. Jordan stated in his initial report that there was alienation towards Ms. Palazzolo stemming in part from alienation tactics employed by Ms. Mire. Dr. Jordan and Dr. York both agreed that I.P. was parroting what she heard from Ms. Mire. Dr. Michelle Hamilton, the clinical psychologist that Ms. Pa-lazzolo gave as a collateral source and a former roommate of Ms. Palazzolo, also told Dr. Jordan that I.P.’s alienation was a result of Ms. Mire’s alienation tactics. In his final report, Dr. Jordan stated that the question of Ms. Mire’s possible alienation was far overshadowed by Ms. Palazzolo’s continued anger toward Ms. Mire. Dr. Jordan testified that based on his contact with I.P. and Ms. Mire and his discussions with Dr. York he concluded “there was not one scintilla of evidence that we could rely on to say that there’s any type of abuse, brainwashing, or pressure by Ms. Mire on [I.P.] at this time.” (emphasis added). According to Dr. Jordan, Ms. Mire engaged in some alienation tactics in |[7the beginning, but that was not the primary reason why I.P. currently desired not to see Ms. Palazzolo.
 

 In his August 2005 report, Dr. Jordan recommended that Ms. Mire have sole custody and Ms. Palazzolo’s visitation be terminated. Dr. Jordan, however, recommended that the option be left open for I.P. to have time with her adoptive mother in the future if she wished and that this should be fully respected by Ms. Mire. In his report, Dr. Jordan gave the following reasons for his final recommendation:
 

 • The legal basis for the adoptive mother has been clearly established and recognized. From a psychological stand point however, Ms. Mire’s intentions were to solidify the adult relationship by making Ms. Palazzolo more included in raising I.P. The ending of the adult relationship on a continued hostile basis, however, reveals clearly different ideas on raising I.P., which presents significant stress for the child.
 

 • I.P. is clearly psychologically bonded to her natural mother and has stated she has always felt this way. I.P. does not have a maternal bond to her adoptive mother, Ms. Palazzolo. In addition, Ms. Palazzolo’s continued hostility toward Ms. Mire has further
 
 *759
 
 weakened the relationship between her and I.P.
 

 • The question of possible alienation by the natural mother, Ms. Mire, is far overshadowed by the adoptive mother’s continued anger toward Ms. Mire. Ms. Palazzolo has not been able to recover from the rejection in the previous adult relationship with Ms. Mire. There are a number of indications that she suffers from serious mispercep-tions of I.P. being in danger and abused by her natural mother. To the contrary, I.P. is very comfortable with her natural mother, while at the same time feels alienated toward her adoptive mother. The latter has over determined needs to hold onto control of I.P. as a continuing way to contact and possibly punish the natural mother.
 

 • Dr. York indicated that I.P. can look at her situation more maturely than most children her age. Her specific complaints about her adoptive mother have been reduced, but Dr. York found it difficult to say whether this is due to her not feeling the need to continue reporting the same things over and over or there has been an actual improvement. I.P. indicated that she wants the visits with Ms. Palazzolo terminated but she does not want to hui't her adoptive mother’s feelings.
 

 11sDr. Jordan testified that a fundamental reason for his final recommendation was his finding that there was no maternal bond between Ms. Palazzolo and I.P. The basis for his finding was the self-reporting of Ms. Mire and I.P.
 
 [7]
 
 He testified that during the first six years of I.P.’s life both parents assumed an active role in her rearing. Both parents worked, and both co-parented. The co-parenting was generally positive, and they agreed on most things. During that time, I.P. had a positive relationship with both of them. During that time, neither parent raised any major complaints regarding the other’s parenting.
 
 [8]
 
 Dr. Jordan noted that because Ms. Mire grew up in an extended family and assisted in raising her nieces and nephews, she had more experience than Ms. Palazzolo with babies and young children. For this reason, the parties agreed that Ms. Mire would do more of the basic parenting, which she did. Although during those first six years the family unit consisted of I.P. and both parents, Dr. Jordan testified that the psychological and maternal bonding could not and did not take place equally with both parents. He emphasized that the issue of lesbianism had nothing to do with his position regarding maternal bonding, in particular, or his recommendation, in general.
 

 Explaining his view of maternal bonding, Dr. Jordan testified that at some point a child will psychologically bond to one person as his or her mother; a child will not bond to two mothers. In this case, Dr. Jordan testified that early on there was affection and positive interaction between I.P. and Ms. Palazzolo, but as I.P. entered the cognitive stage of understanding and verbalizing, she began to identify |i9more with Ms. Mire as her mother and to feel
 
 *760
 
 closer to her. Dr. Jordan testified that I.P. told him that starting at age five, she began to feel distant from Ms. Palazzolo, and she realized that Ms. Mire was her mother and Ms. Palazzolo was not. Dr. Jordan testified that he was ill-equipped to say that I.P. sees Ms. Palazzolo as a parent.
 

 In finding a lack of maternal bonding, Dr. Jordan testified that the factors he considered included that I.P. at a certain age began calling Ms. Mire mother and Ms. Palazzolo by her first name and that Ms. Mire reported Ms. Palazzolo to be more of a backup parent. He testified that Ms. Palazzolo was seen as a “helpful parenting figure, someone that [I.P.] felt okay with in earlier years, but it was not dual maternal bonding going on in this case then or now.”
 

 As a general proposition, Dr. Jordan testified that if there is one parent with a weak relationship with the child and that parent is engaging in negative and counterproductive actions that the child is upset about, he would recommend that the other parent have sole custody. He found that such was the situation here. He explained that not only was there a lack of maternal bonding, but Ms. Palazzolo exacerbated the situation by acting in ways towards Ms. Mire that caused I.P. to become further alienated from her and to become upset with her.
 

 Dr. Jordan characterized I.P., who was nine years old at the time of trial, as a child with a high IQ who intellectually functions at a much older age. Dr. Jordan testified that I.P. wanted to talk to the judge and to express her position. Dr. Jordan believed it would be very helpful for the judge to listen to IJP.’s position and her reasons for it. He noted that she was a well-spoken child who could express her position quite clearly. Dr. Jordan testified that he reviewed a series of e-mails that indicated that I.P.’s position was that she did not want to continue visitation with |2qMs. Palazzolo and that she rejected Ms. Palazzolo as being her mother or even her relative.
 

 Dr. Jordan acknowledged that he never found any fault in Ms. Palazzolo’s interaction or visitation with I.P. Although in the beginning a question was raised by Ms. Mire regarding inappropriate sexual behavior on Ms. Palazzolo’s part, he believed that behavior, albeit perhaps inappropriate, did not constitute sexual abuse. Dr. Jordan testified that all test results for both the parents, Ms. Mire and Ms. Palaz-zolo, and the child, I.P., were within normal limits and that he found no evidence of a diagnosable psychological disorder in any of them. Dr. Jordan testified that Ms Mire had some sex role confusion and that she was going through a process of questioning her own identity. He noted that Ms. Mire had raised objections about I.P. being involved in a lesbian-centered community, and he acknowledged that Ms. Mire’s feelings had been transmitted to I.P.
 
 [9]
 

 As noted, Dr. Jordan recommended awarding sole custody to Ms. Mire and terminating visitation with Ms. Palazzolo. Dr. Jordan voiced strong disagreement with Dr. Pellegrin’s recommendation that Ms. Palazzolo be given sole custody, and Ms. Mire be given supervised visitation. He testified that this would increase I.P.’s anger and her sense of frustration, and she would become totally demoralized about the situation. He also cautioned that I.P. could become rebellious and possibly begin acting out in order to change the situation.
 

 
 *761
 
 (ii) Dr. Pellegrin
 

 Dr. Pellegrin, who was qualified as an expert in clinical psychology, was appointed by the court to conduct a second custody evaluation on Ms. Palazzolo’s |21behalf. Dr. Pellegrin conducted her evaluation over a three month period, from September 2006 to December 2006.
 

 As part of her evaluation, Dr. Pellegrin spoke with Margaret Campos, a family friend who knew both Ms. Palazzolo and Ms. Mire for twenty-five years. According to Dr. Pellegrin, Ms. Campos described the pre-separation relationship between the parties as a “committed, monogamous relationship.” Ms. Campos indicated that they saw themselves as a “model lesbian couple” because they were so mutually committed. She also indicated that they were a close family. Ms. Campos described I.P. as extremely attached to both of her moms and indicated that there was no difference between Ms. Palazzolo’s and Ms. Mire’s interaction with I.P. Dr. Pel-legrin testified that Ms. Campos’ description of the pre-separation relationship was consistent with that of Ms. Byers’ description, which is discussed below.
 

 Dr. Pellegrin found it significant that the parties had agreed for about a year, from about September 2003 to May 2004, to a shared custody plan. She explained that this meant Ms. Mire had no concerns at that time about I.P. spending half of the time with Ms. Palazzolo. Dr. Pellegrin opined that it was not Ms. Palazzolo, but Ms. Mire who was overly enmeshed in the relationship with I.P. As an example, Dr. Pellegrin noted that despite the mental health experts (Dr. York and Dr. Jordan) opining that I.P. should be enrolled in regular school, Ms. Mire desired to continue home-schooling I.P. Dr. Pellegrin testified that Dr. York informed her that he believed Ms. Mire had an investment in the home-schooling and that he thought this was indicative of over-involvement and difficulty letting go.
 

 Disagreeing with Dr. Jordan’s finding that three was no maternal bonding, Dr. Pellegrin testified that the bonding and attachment would have taken placej^years before the conflict between the parents began and that it occurred. Dr. Pellegrin observed that Ms. Mire was very capable of rewriting history, including that I.P. was never emotionally close to Ms. Palaz-zolo. According to Dr. Pellegrin, a more accurate description of what Dr. Jordan found to be a lack of maternal bonding was a significant disruption in the maternal bonding or evidence of severe parental alienation.
 

 Parental alienation, Dr. Pellegrin explained, exists on a continuum, and in this case the alienation was severe.
 
 [10]
 
 In her report, she noted that there was overwhelming evidence of egregious parental alienation. She explained that “Ms. Mire’s acknowledgement that she does not wish for her daughter to have contract with Ms. Palazzolo and her reluctant agreement that Ms. Palazzolo may, perhaps, serve as an ‘alternate parent figure’ in some undetermined future, underscores her alienating attitude and behavior.” Dr. Pellegrin testified that her classification of the alienation as severe was based on the following: (i) the level of LP.’s hatred of Ms. Palazzo-lo; (ii) how adamant I.P. was about not wanting to have anything to do with Ms. Palazzolo; (iii) I.P.’s statement that there was nothing that Ms. Palazzolo could do to repair their relationship; (iv) I.P.’s statement that she never wanted to see Ms.
 
 *762
 
 Palazzolo again; and (v) the fact that Ms. Mire’s alienating statements and behaviors had resulted in a disruption of not only I.P.’s relationship with Ms. Palazzolo, but also how I.P. viewed everything that Ms. Palazzolo represented — her religion, friendships, and lifestyle.
 

 Dr. Pellegrin explained that she did not believe Ms. Mire was engaging in intentional alienation; rather, she believed Ms. Mire was engaging in indirect 123aIienation through her statements to I.P. and her behaviors around I.P., which had affected the way I.P. felt about Ms. Palazzolo. Part of the alienation process, Dr. Pelleg-rin explained, was that Ms. Mires’ feelings were directly or indirectly being transmitted to I.P., who in turn was mirroring what her mother was feeling. Dr. Pelleg-rin cited as an example of Ms. Mire’s alienating activity her sharing with I.P. the termination papers filed in court and emails between her and Ms. Palazzolo.
 

 Dr. Pellegrin explained that this case presented a complicated situation in which for six years there was an intact nontraditional family.
 
 [11]
 
 One family member, Ms. Mire, then decided that the family’s lifestyle was bad and inappropriate and to refute it.
 
 [12]
 
 Dr. Pellegrin explained that in order for Ms. Mire to refute the lifestyle and sexual orientation that she voluntarily chose and into which she voluntarily chose to bring I.P., Ms. Mire had to reject Ms. Palazzolo. Ms. Mire therefore had determined that due to Ms. Palazzolo’s sexual orientation she was no longer fit to be a part of I.P.’s life.
 

 When discussing Ms. Mire’s perception of Ms. Palazzolo, Dr. Pellegrin testified that she deliberately selected the word “demonized,” stating in her report:
 

 [Wjhile it is certainly Ms. Mire’s right to make a different decision for herself regarding her sexual interests, she has no right to demonize homosexuality since she and Ms. Palazzolo made a choice to bring a child into their then homosexual relationship. To now characterize Ms. Palazzolo’s sexual orientation as wrong and/or sinful can serve noj^purpose but to alienate [I.P.] from Ms. Palazzolo, which is exactly what has happened, (emphasis added).
 

 Dr. Pellegrin explained that Ms. Mire’s views regarding Ms. Palazzolo had been transmitted to I.P. As a result, I.P. spoke in negative terms about the organization of children of lesbian and gay parents that she previously participated in with pleasure. Dr. Pellegrin elaborated that I.P. went from being raised in an environment where being lesbian was a normal part of her family’s life to it being something bad or immoral. Dr. Pellegrin testified that it was confusing for I.P. to figure out how she was supposed to love a parent when
 
 *763
 
 that parent was engaging in bad or immoral activity. Dr. Pellegrin stated that she had concerns that this may have a damaging long term impact on I.P.
 

 Dr. Pellegrin pointed out that Ms. Mire accused Ms. Palazzolo of engaging in inappropriate sexual conduct towards I.P. and in having a previous history of “voyeurism and exhibitionism with I.P.” Dr. Pellegrin further testified that Ms. Mire’s present position was that Ms. Palazzolo wanted to have a relationship with I.P. because she could not have a relationship with her and that Ms. Palazzolo saw I.P. as a “surrogate partner” or “substitute lover.” These allegations of sexual improprieties, Dr. Pelleg-rin noted, were further evidence of a pattern of severe parental alienation.
 

 Because alienation often spreads to the family and friends of the alienated parent, Dr. Pellegrin questioned I.P. whether she saw members of Ms. Palazzolo’s family. I.P. replied that she was not really close to anyone in Ms. Palazzolo’s family. Dr. Pel-legrin also noted that Ms. Mire told her that I.P. changed her last name from Pa-lazzolo to Mire on her school books and papers and distanced herself from Ms. Pa-lazzolo in every way.
 

 12r,Pr. Pellegrin described I.P.’s responses regarding her negative feelings towards Ms. Palazzolo as “rehearsed.” By “rehearsed,” Dr. Pellegrin testified that she meant that there were some points that I.P. made that were unelaborated and on which I.P. was unable to supply the facts to support her beliefs. Dr. Pellegrin provided as an example that I.P., when pressed, acknowledged that contrary to her allegation that Ms. Palazzolo had told everyone at her school that she was a lesbian, she only told the mother of one of her friends and that friend was no longer living in the area. Although I.P. told Dr. Pellegrin that Ms. Palazzolo’s problem was that she wanted to live as a lesbian and that she was involving her, I.P. was unable to elaborate on what she meant. Dr. Pel-legrin testified that on her second visit to Ms. Palazzolo’s home she observed that I.P.’s interactions were very positive and entirely different from those she exhibited in her office.
 

 Dr. Pellegrin characterized LP.’s communication with Ms. Palazzolo as rude and disrespectful. For example, she pointed out that LP.’s contact name on her cell phone for Ms. Palazzolo was “stupid” and that I.P. spat on Ms. Palazzolo. Dr. Pel-legrin testified that allowing a child to feel that it is permissible to be disrespectful and rude and to spit on a parent or an adult has consequences. Dr. Pellegrin faulted Ms. Mire for doing nothing regarding I.P.’s rude and inappropriate comments and behaviors.
 

 Dr. Pellegrin testified that she investigated the hypotheses that LP.’s reactions were perhaps the result of Ms. Palazzolo failing to handle the situation appropriately and causing I.P. to become further estranged. She, however, found that Ms. Palazzolo handled herself well in addressing I.P.’s anger, hostility, and disrespectful behaviors. As one example, Ms. Palazzolo attempted to deal with |2f¡I.P.’s dislike of the activities they did together on weekend visits by seeking suggestions earlier in the week, but I.P. refused to give any input.
 

 Dr. Pellegrin testified that the alienation process can get more complicated if the alienated parent responds in ways that do not always serve the parent-child relationship and which backfire on the alienated parent. She testified that Ms. Palazzolo had done so in this case. In her report, Dr. Pellegrin recognized that Ms. Palazzo-lo responded by engaging in inappropriate behavior, stating:
 

 While Ms. Palazzolo has been understandably distraught over the loss of her family and her child, many of her com
 
 *764
 
 ments, as well as her behavior at times have not helped the situation. Several of her accusations and statements, including those in which she accused Kathe Posin of murder are inexcusable. These comments have only added credence to June Mire’s accusations that Ms. Palazzolo is emotionally unstable and threatening, though there is no evidence that Ms. Palazzolo is dangerous or a threat to others. Rather, her ranting reflects her extreme frustration, pain, and confusion over events of the past year. However, these feelings do not excuse her behavior. Ms. Palazzolo is in need of anger management counseling in order to learn more appropriate ways of managing anger and frustration.
 

 Dr. Pellegrin testified that Ms. Mire saw I.P. as a special child who was gifted and who had the capacity to make independent decisions. Dr. Pellegrin, however, indicated that she did not believe I.P. was prepared to make the kinds of decisions that Ms. Mire thought I.P. could make, emotionally or developmentally.
 

 As noted, Dr. Pellegrin’s recommendation was that Ms. Palazzolo be awarded sole custody and that Ms. Mire be given supervised visitation. Dr. Pellegrin explained that her recommendation was intended to be a temporary step toward what she hoped to be a long term goal of complete reunification. She further explained that her recommendation was intended to provide a transition period so that there could be a movement toward a more normal child-parent relationship between I.P. and Ms.- Palazzolo and a movement toward a 50/50127traditional split custody situation. When questioned as to what would happen during the transition period that she was recommending to make co-parenting more positive, Dr. Pel-legrin replied that she hoped through therapy the parties could learn to co-parent in the child’s best interest. Elaborating, she testified that she hoped Ms. Mire would “get some guidance and maybe some insight into the ways that she has contributed, and the alienation will decrease,” and Ms. Palazzolo would “get some work on the ways that she responds and her reactions when she’s upset.” Dr. Pellegrin, however, acknowledged that her hopes of moving these parties to a traditional split custody situation were “pie in the sky.”
 

 (iii) Dr. Lockman
 

 Dr. Lockman, who was qualified as an expert in the area of development psychology and child development, testified on Ms. Palazzolo’s behalf. Dr. Lockman’s testimony focused on attachment theory. He defined attachment as a deep emotional bond between an infant and a small number of caregivers. Dr. Lockman explained that once formed, an attachment bond has important implications for development through adulthood. Dr. Lockman further explained that a sensitive period for the development of attachments exists; we are biologically programmed to form attachments during the first eighteen months of life. Dr. Lockman was critical of Dr. Jordan’s finding of no maternal bonding. He was also critical of Dr. Jordan’s apparent lack of knowledge of current attachment theory. Because Ms. Palazzolo was consistently available in providing care for I.P. during the sensitive period, Dr. Lockman opined that “parental bonding between Angie [Palazzolo] and [I.P.] was almost certain.”
 

 Dr. Lockman testified that the listing of Ms. Palazzolo’s name on LP.’s birth certificate was significant in that the names on the birth certificate are meant to 12fiindicate the primary caregivers, the expectations regarding the development of bonding of the child, and initial commitment. He also agreed that Ms. Mire’s
 
 *765
 
 recognition of Ms. Palazzolo as a primary caregiver of I.P. was evidenced by both the adoption home study, which showed positive interaction between Ms. Palazzolo and I.P. during the sensitive period, and Ms. Mire’s will, which was executed when I.P. was four years old and designated Ms. Palazzolo as I.P.’s legal guardian. Dr. Lockman indicated that it would be a concern to him in terms of attachment that Dr. Jordan opted not to interview any of the staff at UMS where I.P. attended preschool.
 

 Dr. Lockman explained that once an attachment is formed it is highly unlikely that a child would become unattached. Rather, he would describe a change in the relationship with the child in terms of the quality of the attachment having been disrupted. He identified possible causes of disruption of the attachment to be a parent leaving, having a psychotic problem, changing dramatically, being absent, or being the subject of parental alienation. He testified that it would be extraordinary for a five to six year old child to detach from a parent solely because of the child’s knowledge that the parent is her adoptive parent rather than her birth parent.
 

 Insofar as Dr. Jordan’s reliance on I.P.’s calling Ms. Mire “mom” and Ms. Palazzolo “Angie” at age four or five, Dr. Lockman found this insignificant. He noted that children in that age range do not like to use the same name for the same thing so they often try to distinguish. He also stated that at some point I.P. called both Ms. Mire and Ms. Palazzolo by their first names, and this would be a license or permission for the child to use that form in addressing a parent.
 

 123Pr. Lockman testified that he would have concerns with allowing a nine year old alienated child to determine if and when she had visitation with the alienated parent. Allowing the child to make such a decision, Dr. Lockman explained, was putting the child in a position where she has to act like an adult. He further explained that “[gjiving a child a choice in that matter is giving a child too much power and it is unreasonable to put that burden on a child.” He noted that this suggested that the child could dissolve important relationships. Dr. Lockman explained that separating a child from a primary caregiver had profound developmental consequences and thus separation of an alienated child from the alienated parent was not advisable. He also noted that it was difficult for the relationship between the alienated child and the alienated parent to improve if the alienating parent wanted the other parent out of the child’s life.
 

 Dr. Lockman testified that he was familiar with the literature on the development of children in lesbian families, and this was one of the areas in which there is uniformity of opinion that virtually no differences exist between children raised in lesbian households and those raised in other family formats, including two-parent heterosexual households.
 
 [13]
 
 On cross-examination, Dr. Lockman acknowledged that a child in a lesbian household may be presented with different problems in attending school and socialization and that the child could experience teasing or being made fun of at school. Dr. Lockman acknowledged that he had never done a custody evaluation and that he never interviewed I.P.
 
 [14]
 

 
 *766
 
 |an(iv) Ms. Byers
 

 Ms. Byers testified that during the summers of 2000, 2001, and 2003 she worked as an intern and a field assistant in Ms. Mire’s home office, which was located in the Lakeview family home. Ms. Byers also acted as I.P.’s babysitter occasionally. Ms. Byers described herself as not only having a work relationship with Ms. Mire, but also as being a friend of the family. Ms. Byers described the family as being a joint household in which Ms. Palazzolo participated in making decisions. She testified that I.P. called both Ms. Mire and Ms. Palazzolo not only mom, but also by their first names: June and Angie. During the summers of 2000 and 2001, Ms. Byers observed both Ms. Mire and Ms. Palazzolo to have a very warm, loving, caring mother-daughter relationship with I.P.
 

 During the summer of 2003, Ms. Byers observed a dramatic change in the family relationships. At that time, Ms. Palazzolo was working in California and coming home on some weekends. Mrs. Posin was often present at the house and often brought gifts for I.P. Also during the summer of 2003, Ms. Mire informed Ms. Byers that she and Ms. Palazzolo were separated and asked her not to communicate with Ms Palazzolo. Ms. Byers testified that she was surprised about their separation. She noted that there was no indication that they had been having any problems; to the contrary, earlier that year they had all taken a family trip to Italy.
 

 Also during the summer of 2003, Ms. Byers testified that she observed significant changes in both Ms. Mire’s and I.P.’s personalities and behaviors. I.P. created less art work, was not as happy, was a lot grumpier, was a lot bossier, was more demanding, often seemed scared of what was occurring, and missed Ms. Palazzolo. Ms. Mire was skinnier, often cried, often was visibly upset, and often |31said she was stressed. Ms. Mire would leave the house for long periods without informing Ms. Byers where she was going. Ms. Mire’s work habits were also totally different than they had been in the past summers. Ms. Byers testified that she was so concerned with these changes in Ms. Mire’s emotional state that she contacted Ms. Pa-lazzolo despite Ms. Mire’s instructions that she not do so. Ms. Byers testified that on one occasion she saw a letter from Mrs. Posin to Ms. Mire on the kitchen table. Although she was not allowed to testify regarding the hearsay content of the letter, she testified that after reading the letter her perception of the nature of the relationship between Ms. Mire and Mrs. Posin changed.
 

 (v) Ms. Williams
 

 Ms. Williams testified that she was I.P.’s teacher for three years at UMS where I.P. attended preschool from ages two to five (roughly from 1999 to 2002). According to Ms. Williams, Ms. Palazzolo dropped I.P. off at school, picked her up from school, and attended school functions. She described the relationship between Ms. Pa-lazzolo and I.P. as an endearing, warm, loving mother-daughter relationship and testified that I.P. was excited to see Ms. Palazzolo when she came to pick her up in the afternoon. Ms. Williams testified that Ms. Mire also dropped off I.P. at school and attended school functions. Ms. Williams testified that I.P. called both Ms. Mire and Ms. Palazzolo not only mom, but also by their first names — June and “Ang.” Ms. Williams testified that she visited them at their home and baby sat for I.P. She characterized them as a happy family.
 

 (vi) Ms. Pittman
 

 Ms. Pittman, who was the head of St. Martin’s lower school in 2006, testified that
 
 *767
 
 St. Martin’s reopened after Hurricane Katrina in October 2005 and I.P. first enrolled at St. Martin’s in January 2006. Ms. Pittman testified that I.P. DJias done excellently at St. Martin’s both academically and socially. Ms. Pittman, however, described problems that occurred when Ms. Palazzolo came to pick up I.P. from school. According to Ms. Pittman, I.P. would request to call Ms. Mire to ensure that she was leaving with the correct parent, and she would cry. Ms. Pittman testified that I.P. had told her that she did not want to go with Ms. Palazzolo.
 

 (vii) Michelle Mire
 

 Michelle Mire, June’s younger sister by about a year, testified that she and her husband live in Lakeview. She testified that she regularly saw her sister and her niece, I.P., once or twice a week before Hurricane Katrina and that since Hurricane Katrina she saw them a little more sporadically. I.P. spent time at her house, including sleeping over. She took I.P. to the movies and taught her how to sew.
 

 Michelle Mire characterized the relationship between her sister and I.P. as a very loving relationship. She testified that I.P. referred to both Ms. Palazzolo and her sister by their first names: June and Angie. Michelle Mire acknowledged that up until a few years ago Ms. Palazzolo took an active role in caring for I.P. — fed her, bathed her, dressed her, took her to school, and took her to the doctor. Although she observed a care giving relationship between Ms. Palazzolo and I.P., Michelle Mire testified that she did not observe a strong emotional tie between them especially in the last couple of years. Indeed, she testified that within the last three years the relationship between Ms. Palazzolo and I.P. deteriorated and that I.P. was afraid of Ms. Palazzolo. She stated that based on things she had witnessed and seen she did not think Ms. Palazzolo presently was the “best parent in the world.”
 

 laaMichelle Mire testified that in late 2002 or early 2003, Ms. Palazzolo denigrated June Mire to her. She told her that her sister was not fit to mother I.P. and that her sister was behaving erratically. Michelle Mire detailed a stalking incident that occurred in July 2005 when Ms. Palaz-zolo stalked her and her sister by following them in her vehicle with I.P. in her car. This occurred when her sister was taking her out to dinner for her birthday. Michelle Mire further testified that in July 2005 her sister brought some of her things over to her house to store because Ms. Palazzolo had threatened to destroy her things while she was out of town. Michelle Mire still further testified that her sister told her that Ms. Palazzolo was a danger to herself, to her sister, and that she was afraid she might hurt I.P.
 

 Michelle Mire testified that she had been through a divorce herself with two young children and that she counseled her sister that it was in the child’s best interest to maintain a relationship with the noncustodial parent. Michelle Mire, however, testified that she was opposed to her sister moving back into the Lakeview house in 2004 and attempting to reconcile. She stated that she had not heard her sister say anything of a denigrating nature about Ms. Palazzolo in front of I.P. and that she would have corrected her if she had.
 

 (viii) Ms. Lane
 

 Catherine Lane, June Mire’s older sister by fifteen years, testified that she lived in Morgan City. Ms. Lane testified that when June Mire was a young girl living at home she helped care for Ms. Lane’s children.
 

 During 2004, when Ms. Mire and Ms. Palazzolo were sharing custody of I.P., they both evacuated for a hurricane to Ms.
 
 *768
 
 Lane’s house in Morgan City. At that time, Ms. Palazzolo informed Ms. Lane that the problem between them was Ms. Mire’s desire to attend church and to take I.P. with her to church. Ms. |,^Palazzolo did not want them to go to church or she wanted
 
 them to go
 
 to the church she selected. Ms. Lane (like her sister, Michelle Mire) testified that she was opposed to Ms. Mire’s moving back into the Lakeview house in 2004 and attempting to reconcile.
 

 Ms. Lane described a conversation that she had with Ms. Palazzolo two days before Hurricane Rita struck (which was a few weeks after Hurricane Katrina). Ms. Palazzolo called her to ask if June Mire was at her house. She informed Ms. Pa-lazzolo that her sister was at their brother’s house in Austin, Texas, and that she was doing fine. Ms. Palazzolo replied that she was glad that June Mire was fíne now because she was never going be fine again and that the next time she saw her she would be in jail, a mental institution, or dead, and that maybe she could carry her coffin. Ms. Lane testified that she called June Mire and related the conversation to her and that she also documented the conversation in an e-mail.
 

 Ms. Lane described I.P. as a “very adult-like child” and very bossy and self-centered.
 

 On October 31, 2007, the trial court rendered judgment awarding sole custody to Ms. Mire, terminating Ms. Palazzolo’s visitation, appointing Dr. Howze as reconciliation therapist for Ms. Palazzolo and I.P. with the cost of same to be paid by Ms. Palazzolo; ordering Ms. Mire to cooperate in therapy; and continuing Dr. York as the child’s therapist with the cost to be paid by Ms. Mire. This appeal followed.
 

 DISCUSSION
 

 In most child custody cases, including this case, the trial court’s determinations are based heavily on factual findings.
 
 See Richardson v. Richardson,
 
 07-0430 (La.App. 4 Cir. 12/28/07), 974 So.2d 761. An appellate |.%eourt cannot set aside a tidal court’s factual findings in the absence of manifest error or unless those findings are clearly wrong.
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989). When the factual findings are based on the credibility of witness’s testimony, the fact finder’s decision to credit a witness’s testimony must be given great deference by the appellate court.
 
 Id.
 

 The focus in any dispute over custody is on the best interest of the child. La. C.C. art. 131 (which provides that “the court shall award custody of a child in accordance with the best interest of the child.”) Because the trial judge is in the best position to ascertain the best interest of the child based on the particular circumstances of the particular case, the trial court’s custody determination is entitled to great weight and will not be disturbed by an appellate court absent a clear showing of abuse of discretion.
 
 McKenzie v. Cuccia,
 
 04-0112, p. 3-4 (La.App. 4 Cir. 6/23/04), 879 So.2d 335, 338 (citing
 
 Thompson v. Thompson,
 
 532 So.2d 101 (La.1988)). Every child custody case must be viewed within its own particular set of facts.
 
 McKenzie, supra.
 
 Each case must be viewed in light of the child’s age, the situation of the parents, and any other factor relevant to the particular case.
 
 White v. Kimrey,
 
 37,408, p. 7 (La.App. 2 Cir. 5/14/03), 847 So.2d 157, 161. It is a well-recognized tenet in Louisiana jurisprudence that an award of child custody is not a tool to regulate human behavior.
 
 Everett v. Everett,
 
 433 So.2d 705, 708 (La.1983).
 

 Louisiana Civil Code Article 132 provides that absent an agreement, “the court shall award custody to the parents jointly; however, if custody in one parent
 
 *769
 
 is shown by clear and convincing evidence to serve the best interest of the child, the court shall award custody to that parent.” The clear and convincing standard is a heavier burden of proof than the usual civil case preponderance of the evidence IsfiStandard, but is less burdensome than the criminal law beyond a reasonable doubt standard. To prove a matter by clear and convincing evidence means to present “evidence indicating that the thing to be proved is highly probable or reasonably certain.” Bryan A. Garner,
 
 Black’s Law Dictionary,
 
 596 (8th ed.2004).
 

 The prior law (former La. C.C. art. 131) created a rebuttable presumption favoring joint custody, and the courts imposed on the party seeking sole custody the burden of proving that joint custody would not be in the child’s best interest.
 
 Evans v. Lungrin,
 
 97-0541, 97-0577, pp. 7-8 (La.2/6/98), 708 So.2d 731, 735-36 (citing Kenneth Rigby,
 
 1993 Custody and Child Support Legislation,
 
 55 La. L.Rev. 103 (1994)). Under the prior law, the analysis was directed toward the quality of the relationship existing between the parents with respect to the parenting of the child.
 
 Id.
 
 Under the current law, “[t]he test shifted from a negative to a positive one, from why joint custody to both parents is not in the child’s best interest to why sole custody in a particular parent is in the child’s best interest.”
 
 Walet v. Caulfield,
 
 02-2009, pp. 10-11 (La.App. 1 Cir. 6/27/03), 858 So.2d 615, 622-23 (citing
 
 Harper v. Harper,
 
 33,452, p. 5 (La.App. 2 Cir. 6/21/00), 764 So.2d 1186, 1189 (citing
 
 Rigby, supra)).
 

 Summarizing, “[i]f sole custody is at issue: ‘The question changes from why joint custody is not in the best interest of the child to why sole custody in a particular parent is in the best interest of the child. Although these issues may overlap, the burden on the parent seeking sole custody is to demonstrate that the granting of custody to that parent alone will be in the best interest of the child.’ ” Robert C. Lowe,
 
 Louisiana Divorce,
 
 § 7:56 (2008 ed.).
 

 _|_22Article 134 provides twelve factors for the court to consider in determining the best interests of the child.
 
 [15]
 
 These factors have been construed to be nonexclusive, and the trial court has the discretion to determine the relative amount of weight to be given each factor.
 
 Mire v. Mire,
 
 98-1614, pp. 3-4 (La.App. 4 Cir. 3/24/99), 734 So.2d 751, 753. The court is not required to analyze mechanically all of the dozen factors; rather the court should balance
 
 *770
 
 and weigh the factors in view of the evidence presented.
 

 In awarding sole custody to Ms. Mire, the trial court reasoned:
 

 This record clearly reflects that the parties planned the birth, adoption, parenting, education and general raising of the minor child. The adoption decree, June Mire’s will and their general conduct are indicia that their original intent was to parent this child together and presumably forever. Unfortunately, the clarity of that intent became blurred as their relationship deteriorated. With the demise of their relationship co-parenting seemed impossible and the parties simply could not agree on a plan of joint custody/visitation that worked for them and in the child’s best interest.
 

 Therefore this court after reviewing the entire record and applying the applicable law as provided in Louisiana Civil Code article 131, 132 and 134 adopts the recommendation of the court appointed custody evaluation.
 

 Further this court finds that it was the intent, of the parties and is the ruling
 
 of
 
 this court that Angela Palazzolo is a parent of the minor child and as such should be afforded an opportunity to repair the parent child relationship.
 

 lasThe court appointed custody evaluation that the trial court adopted was prepared by Dr. Jordan who recommended that Ms. Mire be awarded sole custody and visitation with Ms. Palazzolo be terminated.
 

 On appeal, Ms. Palazzolo first contends that a
 
 de novo
 
 standard of review applies because the trial court failed to apply the correct legal principles in awarding sole custody to Ms. Mire and terminating her visitation rights. She contends that the trial court failed to require clear and convincing evidence on both of these issues. Ms. Mire counters that the trial court applied the correct standard. We agree. Although the trial court did not mention the clear and convincing standard in its reasons for judgment, the trial court cited the governing Civil Code articles on custody, La. C.C. art. 131, 132, and 134.
 
 [16]
 
 Moreover, the trial court is not required to set forth all of its reasons in its reasons for judgment. We thus find
 
 no
 
 basis
 
 for
 
 departing from the general standard of review applicable in child custody cases.
 

 Ms. Palazzolo further contends that the trial court did not fully recognize her rights as an adoptive parent because of the nontraditional nature of the family unit. However, the record does not support this argument. The trial court concluded in its reasons for judgment that “it was the intent of the parties and is the ruling of this court that Angela Palazzolo is a parent of the minor child.” Moreover, the trial court ruled that the California adoption was entitled to full faith and credit.
 

 Ms. Palazzolo still further contends that the trial court erred and abused its discretion by awarding sole custody to Ms. Mire, especially where Ms. Mire made |39false allegations of sexual abuse against Ms. Palazzolo. Ms. Palazzolo requests that this court render a judgment awarding joint custody and naming her as the domiciliary parent. Ms. Mire counters that although she made allegations of sexual improprieties, she never made allegations of sexual abuse. She further counters that the record supports the trial court’s find
 
 *771
 
 ing that the award of sole custody to Ms. Mire is in the best interest of I.P.
 

 In this case, the general rule favoring joint custody is overcome by the recommendations and testimony of the two experts, Drs. Jordan and Pellegrin, that sole custody is in the child’s best interest. Although the experts disagree on which parent should have custody, they agree that Ms. Mire and Ms. Palazzolo at the present time cannot co-parent. Dr. Jordan testified at trial that his recommendation of sole custody was because the two parents could not agree on the basic child rearing issues — religion, schooling, or medical treatment. Dr. Pellegrin agreed with Dr. Jordan that joint custody was presently not an option. In this regard, she identified in her report the current disagreement between the parties on the following basis parenting issues:
 

 • Education — Ms. Mire chose a Christian school without gifted teachers; Ms. Palazzolo rejected this school in favor of a public school with gifted teachers;
 

 • Religious/spiritual affiliation — Ms. Mire, who had been atheist, is now a strong Christian; Ms. Palazzolo is not and has told I.P. that God is a fake;
 

 • Athletic/recreational — Ms. Palazzolo supported the competitive sport of swimming, which I.P. enjoys. Although I.P. has knee and ankle problems, Ms. Mire enrolled her in ball sports. Ms. Mire would like I.P. to be active, but does not require her to participate in competitive sports.
 

 • Health care — Ms. Palazzolo leans towards homeopathic/alternative medicine; Ms. Mire is a traditionalist with a scientific perspective.
 

 |,inMs. Palazzolo contends that, because I.P. is an “alienated child,” the trial court erred in awarding sole custody to Ms. Mire. In order to address this argument it is necessary to outline briefly the concept of parental alienation.
 

 CONCEPT OF PARENTAL ALIENATION
 

 During the trial, the trial court articulated its understanding of the concept of parental alienation for purposes of this case. As defined by the trial court, parental alienation is simply when a child dislikes one or the other parent. Parental alienation syndrome (“PAS”), as defined by the trial court, is the concept coined by Dr. Richard Gardner to cover instances when parental alienation emanates solely from the non-alienated parent’s actions. PAS thus starts with the presumption that if a child is alienated from one parent (the alienated parent), it must have come from the other parent (the non-alienated parent), in this case Ms. Mire.
 

 The concepts of parental alienation and PAS have been the subject of an extensive commentary and debate in both the medical and legal communities. Over two decades ago, Dr. Gardner coined the concept of PAS, which he characterized as a diagnosable disorder. Dr. Gardner defined the classic alienated child to be one that unjustifiably turns against the alienated (rejected) parent solely as a result of the alienating parent’s hostile actions, parenting tactics, and programming. According to Dr. Gardner, parental alienation can be developed as a result of subtle and often unconscious parental programming. A major organizing belief of the alienating parent is that the child does not need the alienated parent in his or her life. The alienated child engages in splitting behavior; the alienated (rejected) parent is viewed as all bad, and the alienating (other) parent is viewed as all good. Another characteristic of the alienating child is that they have essentially been given power to be hostile and rude toward the rejected
 
 *772
 
 parent. Yet another |41 characteristic of an alienated child is that they advocate their right to choose whether they will see their parent.
 

 Eight specific symptoms of PAS have been identified:
 

 [1] Campaign of denigration: denigration of the targeted parent completely, especially in the presence of the alienating parent. The children express profound hatred for the targeted parent.
 

 [2] Weak rationalizations for the denigration: The children base their justification for their alienation on rationalizations that are completely irrational, and ludicrous (for example, “he takes me to Disney World too much”). These children are unable to provide more compelling reasons for their rejection.
 

 [3] Lack of ambivalence: Denigrating statements are often made with a complete lack of ambivalence by the child. That is, there are no mixed feelings with these children; the targeted parent is all “bad” and the alienating parent is all “good.”
 

 [4] The “Independent Thinker” phenomenon: The child proudly professes that his or her rejection of the targeted parent is their own doing. They will deny any contributions from the alienating parent, who supports the child in their proclamations. The alienating parent reinforces this contention by making statements such as, “I can’t force her to see her dad, if she does not want to.”
 

 [5] Reflexive support of the alienating parent: The child automatically takes the position of the alienating parent; even the alienating parent may not present the argument as forcefully as the supporting child.
 

 [6] Absence of guilt: A PAS child typically has no guilt or remorse over the exploitation of the targeted parent. There is frequently a complete absence of gratitude for gifts, support of any kind, or any involvement by the targeted parent in then’ lives. This lack of guilt cannot be attributed solely to the child’s cognitive immaturity, but is related to the brainwashing and programming by the alienating parent.
 

 [7] Presence of borrowed scenarios: The child’s presentation carries a rehearsed quality. They use language and expressions that are clearly not their own. Their verbalizations appear to be coached and rehearsed, and the only source of the borrowed scenarios appears to be the alienating parent.
 

 [8] Animosity toward the extended family of the alienated parent: The targeted parent’s extended family (e.g., aunts, uncles, cousins, grandparents) is included in the animosity. These individuals are also |42perceived as having negative qualities or using inappropriate actions since they are associated with the targeted parent. Any attempt by the extended family to counter the denigration of the targeted parent is viewed by the child as an attack on his or her beliefs.
 

 Dr. Robert A. Evans,
 
 Treatment Considerations with Children Diagnosed with PAS,
 
 80-APR Fla. B.J. 69 (2006)(emphasis added).
 

 In addition to identifying the characteristics typically exhibited by an alienated child, the jurisprudence has also identified certain characteristics typical of an alienating parent and an alienated parent. Characteristics typical of an alienating parent include:
 

 • Allows and insists that child make decisions about contact;
 

 • Refuses to hear positive comments about rejected parent, and quickly discounts good times as trivial and unimportant;
 

 
 *773
 
 • No encouragement of calls to other parent in between visits; rationalizes that child does not ask;
 

 • Sets few limits or is rigid about routines, rules and expectations;
 

 • Refuses to speak directly to the other parent; refuses to be in same room or close proximity; does not let target parent come to door to pick up child;
 

 • Body language and nonverbal communication reveals disinterest, disdain and disapproval;
 

 • Rejected parent discouraged or refused permission to attend school events and activities;
 

 • Does not believe that child has any need for relationship with other parent;
 

 • Portrays other parent as dangerous, may inconsistently act fearful of other parent in front of child;
 

 • Exaggerates negative attributes of other parent and omits anything positive;
 

 • Delusional false statements repeated to child; distorts history and other parent’s participation in the child’s life; claims other parent has totally changed since separation;
 

 |4S* Does not correct child’s rude, defiant and/or omnipotent behavior directed towards the other parent, but would never permit child to do this with others;
 

 • False or fabricated allegations of sexual, physical and/or emotional abuse;
 

 • Denigrates and exaggerates flaws of rejected parent to child;
 

 • Over-involves child in adult matters and litigation; and
 

 • Extreme lack of courtesy to rejected parent.
 

 Nicholas Bala, Barbara-Jo Fidler, Dan Goldberg, & Clame Houston,
 
 Alienated Children and Parental Separation: Legal Responses in Canada’s Family Comis,
 
 33 Queen’s L.J. 79, 88 (2007)(“£aZa ”). Characteristics typical of an alienated parent that make his or her rejection or alienation more likely include:
 

 • Harsh, rigid, and punitive parenting style;
 

 • Loses temper, angry, demanding, intimidating character traits, but not to level of abuse;
 

 • Counter-rejecting behavior;
 

 • Lacks empathic connection to child;
 

 • Inept and unempathic pursuit of child, pushes calls and letters, unannounced or embarrassing visits;
 

 • Challenges child’s beliefs, attitudes, and tries to convince them otherwise;
 

 • Dismissive of child’s feelings and negative attitudes; and
 

 • Vents rage, blames alienating parent for brainwashing child and takes no responsibility.
 

 Id.
 
 Both Ms. Mire and Ms. Palazzolo exhibited several of these characteristics.
 

 PAS as a diagnosable disorder is considered controversial, and PAS testimony has been criticized as lacking an adequate scientific basis for admissibility. Jennifer Hoult,
 
 The Evidentiary Admissibility of Parental Alienation \uSyndrome: Science, Laio, and Policy,
 
 26 Children’s Legal Rts. J. 1 (2006)(noting that “science, law, and policy all support PAS’s present and future inadmissibility.”) A major criticism of PAS, which was voiced by Dr. Pellegrin in this case, is that it focuses almost solely on the alienating parent as the source of the child’s alienation.
 

 An alternative theory has have been proposed that focuses on the alienated child. Joan B. Kelly & Janet R. Johnston,
 
 The Alienated Child: A Reformulation of Parental Alienation Syndrome,
 
 39 Fam. Ct. Rev. 249, 251 (2001). The alternative theory defines an alienated child as “one
 
 *774
 
 who persistently expresses unreasonable negative feelings and beliefs (such as anger, hatred, rejection, and/or fear) toward a parent that are significantly disproportionate to the child’s actual experience with that parent.” Robert M. Wallack,
 
 When the Alienated Child Refuses to Visit Swift and Decisive Action is Needed,
 
 7/28/2008 N.Y.L.J. 9. An alienated child conveys his rejection without ambivalence.
 
 Id.
 
 The alienated parent typically is a “ ‘good’ parent who has no history or physical or emotional abuse of the child, and while there may be some ‘kernel of truth’ to the child’s complaints about the rejected parent, the child’s grossly negative views and feelings are a significantly distorted and exaggerated reaction.”
 
 Id.
 
 The alienated child formulation, similar to PAS, characterizes the child’s behavior as pathological. G. Kim Blank & Tara Ney, Article,
 
 The (De) construction of Conflict in Divorce Litigation: A Discursive Critique of “Parental Alienation Syndrome” and “The Alienated Child,”
 
 44 Fam. Ct. Rev. 135,143 (2006).
 

 Although parental alienation has not been recognized as a true psychological syndrome, it has been recognized as a psychological condition that can be harmful to a child’s long term emotional development. Moreover, “the conduct of one | ^parent in denigrating the other parent and undermining the child’s relationship with that parent, an adult with whom the child has had a very important relationship, is a form of emotional abuse.”
 
 Bala, supra.
 

 Dr. Gardner recommended that in cases of severe PAS the court remove the child from the alienating parent and award sole custody to the alienated parent. This drastic remedy has not been proven scientifically to be successful and has been criticized. Explaining what helps and what hurts in addressing alienation, a commentator noted;
 

 [W]hat helps is early prevention of alienation, a good assessment of the multiple factors that contribute to alienation within the child and family, clear court orders that affirm parental rights and restore an appropriate access plan (one that the child can tolerate); ongoing case management, and family-focused therapy (not just parent-child reunification). What hurts is to do nothing, long delays where the child has no contact with the rejected parent, draconian punishments and threats, “parentectomies” (severing the child’s relationship with the aligned parent abruptly), ongoing litigation in the adversarial legal system, and total disregard for the child’s ongoing distress or the teenager’s need to have some choice in those more difficult cases that are resistant to resolution.
 

 Janet R. Johnston,
 
 Children of Divorce Who Reject a Parent and Refuse Visitation: Recent Research and Social Policy Implications for the Alienated Child,
 
 38 Fam. L.Q. 757, 774-775 (2005).
 

 In this case, Dr. Pellegrin found the alienation to be severe and recommended the same remedy that Dr. Gardner recommended in cases of severe PAS — awarding sole custody to the alienated parent. Dr. Pellegrin, however, explained that her recommendation was not based on PAS;
 
 [17]
 
 rather, her recommendation was based on the unique facts of this case, which involves a nontraditional family.
 

 14f¡Dr. Jordan agreed that I.P. is an “alienated child” in that she freely expresses hatred or intense dislike towards
 
 *775
 
 Ms. Palazzolo (the rejected parent) and shows a complete lack of ambivalence. Dr. Jordan, however, testified that I.P. is not a classic alienated child as defined by Dr. Gardner (who Dr. Jordan acknowledged to be the foremost authority on parental alienation) because her alienation is not solely due to Ms. Mire’s (the alienating parent’s) alienation tactics. Rather, Dr. Jordan testified that I.P. does not want to have visitation contact with Ms. Palazzolo for a variety of reasons, and alienation is just one of those reasons. As noted, Dr. Jordan strongly disagrees with Dr. Pelleg-rin’s recommendation that sole custody should be awarded to Ms. Palazzolo.
 

 Both experts thus agree that I.P. is an alienated child and that sole custody in one parent is warranted, albeit for different reasons. We thus turn to the issue of whether Ms. Mire met her burden of establishing that the award of sole custody to her is in the best interest of the child.
 

 BEST INTEREST OF THE CHILD
 

 The paramount consideration for determining child custody is the best interest of the child.
 
 See
 
 La. C.C. art. 131. As noted, Article 134 provides twelve relevant factors for the court to consider in determining the best interests of the child. Only two of those factors relate to parental alienation: factors (6) and (10).
 

 Factor (6) relates to “[t]he moral fitness of each party, insofar as it affects the welfare of the child.” Factor (6) comes into play because moral fitness includes a parent’s attitudes toward the other parent.
 
 Goodwin v. Goodwin,
 
 618 So.2d 579, 586 (La.App. 2d Cir.1993)(finding a parent’s intentionally damaging a child’s relationship with his father by referring to him as a adulterer and using the children |47as instrumentalities to inflict pain on a former spouse is a serious shortcoming in the area of moral fitness).
 

 Factor (10) relates to “[t]he willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.” Dr. Jordan testified that he agreed with Dr. York’s statement in his August 15, 2006 letter that Ms. Mire as a parent is not supporting the development of a relationship between Ms. Palazzolo and I.P. Dr. Jordan, however, explained that he did not consider the ability and willingness of each parent to facilitate and to encourage a relationship with the other parent an important factor when, as in this case, the child does not see the child’s relationship with the other parent in the context of the other person being a parent.
 

 Given the undisputed fact that Ms. Pa-lazzolo is LP.’s parent coupled with Ms. Mire’s failure to support the relationship between Ms. Palazzolo and I.P., we find these two factors weigh in Ms. Palazzolo’s favor. We now consider the other ten factors.
 

 Factor (1) concerns “the love, affection, and other emotional ties between each party and the child.” At this time, the relationship between Ms. Mire and I.P. is very positive, and they have a strong emotional tie. In contrast, the relationship between Ms. Palazzolo and I.P. is very negative, and there is either no maternal bonding or a disruption in the attachment between them that once existed. Although we recognize that Ms. Mire may have contributed to the deterioration in the relationship between I.P. and Ms. Palazzolo, we nonetheless find this factor weighs in favor of Ms. Mire.
 

 Factor (2) relates to “[t]he capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education andj^rearing of the child.” Both parties have the capacity to give I.P. love, affection, and spiritual
 
 *776
 
 guidance. However, at this time, Ms. Mire has a superior capacity and disposition to continue the education and rearing of I.P. Ms. Mire home schooled I.P. from kindergarten through third grade, and she has continued to assist I.P. with her school work. As discussed below, I.P. is presently settled in her current school environment, which Ms. Mire strongly supports. We thus find this factor weighs in favor of Ms. Mire.
 

 Factor (3) addresses “[t]he capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.” Both parties are financially capable of providing for the child’s basic needs. However, Ms. Palaz-zolo has asserted a claim in this proceeding for child support. Ms. Mire has not. Moreover, as noted elsewhere, Ms. Mire is financially responsible for paying all of I.P.’s private school tuition and expenses. Ms. Mire has represented that she has always carried I.P. on her health insurance. With regard to obtaining health care, Ms. Palazzolo raised an issue regarding Ms. Mire’s failing to take appropriate measures to obtain medical treatment for a skin condition that I.P. developed. Ms. Palazzolo believed that Ms. Mire failed to have the condition treated soon enough. Dr. York acknowledged that Ms. Palazzo-lo’s concerns could have been valid; he indicated that he wondered why it took Ms. Mire so long to get I.P.’s skin condition treated. However, Dr. Pellegrin testified at trial that she did not have any concerns about Ms. Mire’s providing appropriate medical treatment to I.P. Dr. Pellegrin added that “[y]ou can look at [I.P.] and tell that she’s a well-taken care of child.” Dr. Pellegrin thus acknowledged that Ms. Palazzolo’s concerns on this issue could be characterized as alarmist. We find this factor weighs in favor of Ms. Mire.
 

 _|4i,Factor (4) relates to “[t]he length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.” Because of Hurricane Katrina, the family home in Lakeview where the parties lived together from 1998 to 2005, with the exception of the one year that Ms. Mire lived in an apartment, no longer exists. Since August 9, 2005, Ms. Mire and I.P. have lived in the house Ms. Mire purchased in Jefferson Parish. Ms. Mire’s house is located minutes from LP.’s school. At this house, I.P. has numerous pets, including her dog. Ms. Palazzolo rents an apartment in the Mid-City area of New Orleans, which she characterizes in her brief to this court as a stable and adequate home environment. Ms. Palazzolo will not allow I.P. to bring her dog with her to Ms. Palazzolo’s apartment. We find this factor weighs in favor of Ms. Mire.
 

 Factor (5) is “[t]he permanence, as a family unit, of the existing or proposed custodial home or homes.” Although Dr. Pellegrin questioned the appropriateness of it, Mrs. Posin and her teenage son reside with Ms. Mire. I.P. has a close relationship with the Posins and their extended family. As noted, Ms. Mire’s extended family, including her brothers and sisters, have been a part of I.P.’s life. Her sister, Michelle Mire, regularly interacts with I.P. Ms. Mire’s other sister, Ms. Lane, has provided a place for them to stay in evacuating from hurricanes. Likewise, Ms. Mire’s brother who lives in Austin, Texas, allowed both Ms. Mire and I.P. to live with him and his family for about two months in the aftermath of Hurricane Katrina. No evidence was presented regarding I.P. being close to any of Ms. Palazzolo’s extended family. To the contrary, I.P. reported that she was not close to any of Ms. Palazzolo’s family. We find this factor weighs in favor of Ms. Mire.
 

 
 *777
 
 lsnFactor (7) is “[t]he mental and physical health of each party.” Neither party has any physical health problem that interferes with her ability to parent. Although the experts recommended counseling for both parties, neither party has any mental health problem that interferes with her ability to parent. This factor is neutral.
 

 Factor (8) relates to “[t]he home, school, and community history of the child.” I.P. has resided with Ms. Mire since August 2005. Insofar as her community history, I.P. has voiced a dislike for the Unitarian Church that Ms. Palazzolo attends. I.P. attends a Presbyterian Church with Ms. Mire, and she attends an Episcopal school, St. Martin’s. Since this litigation commenced, I.P. has gone through an adjustment from home schooling to regular school. It is undisputed that I.P. smoothly made this transition and that she presently is doing excellently at school both academically and socially. Ms. Mire is financially responsible for all of I.P.’s private educational expenses and supports her current school environment. Ms. Palazzo-lo, on the other hand, would prefer that I.P. attend school elsewhere and does not like I.P.’s current school. At the present time, it clearly would not be in the child’s best interest to disrupt the status quo of her school environment. For this reason, this factor weighs in favor of Ms. Mire.
 

 Factor (9) is “[t]he reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.” In this regard, Dr. Jordan testified I.P., who was nine years old at the time of trial, intellectually functions at a much older age and is capable of clearly expressing her position. Dr. Pellegrin, on the other hand, questioned I.P.’s ability to make such decisions. At trial, the trial judge twice interviewed I.P. She expressed to him her preference that she continue to reside with Ms. Mire and that she not have any further visitation contact with Ms. Palazzolo. We find this factor weighs in favor of Ms. Mire.
 

 |filFactor (11) is “[t]he distance between the respective residences of the parties.” As noted, Ms. Mire resides in Jefferson Parish, and Ms. Palazzolo resides in Mid-City. Ms. Mire’s estimate is that it is a fifteen-minute drive between their residences. This factor is neutral.
 

 Finally, factor (12) addresses “[t]he responsibility for the care and rearing of the child previously exercised by each party.” As the comment to Article 134 points out, this factor takes into consideration the responsibility for child rearing previously exercised by the parties by evaluating which parent had primary responsibility for the following duties: meals (preparing and planning them); bathing, grooming, and dressing; clothing (purchasing, cleaning, and earing for it); medical care (obtaining and providing it); social interaction (arranging it and transporting to and from); arranging alternative care (baby sitter, day care); bed time (putting to sleep, attending to in the middle of the night, and waking up); discipline; education (obtaining and providing it); and teaching elementary skills (reading, writing, and arithmetic). La. C.C. art. 134, comment (i). Until I.P. was six years old, both parties co-parented and performed many of the above child rearing tasks. For the last few years, Ms. Mire has done the majority of the child rearing. However, this was the result, at least in part, of Ms. Mire’s unwillingness to allow Ms. Palazzolo access to I.P. We thus find this factor to be neutral.
 

 Considering all the factors as well as the particular circumstances of this case, we cannot say the trial court erred in finding Ms. Mire met her burden of establishing that she is entitled to sole custody. We thus turn to the issue of visitation.
 

 
 *778
 
 |52 VISITATION
 

 Visitation is regulated by La. C.C. art. 136, which provides “[a] parent not granted custody or joint custody of a child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would not be in the best interest of the child.” La. C.C. Art. 136. As with custody, the paramount criterion for determining a noncustodial parent’s right to visitation is the best interest of the child. Under Article 136, the parent seeking to restrict or deny access or visitation of the other parent to the child has the burden of proving that visitation would not be in best interest of the child. Since Ms. Mire was the party that sought to terminate visitation, she had the burden of proof on this issue.
 

 Absent conclusive evidence that visitation would seriously endanger the child’s physical, mental, moral, or emotional health, a noncustodial parent is entitled to reasonable visitation rights.
 
 Maxwell v. LeBlanc,
 
 434 So.2d 375 (La.1983);
 
 see Smith v. Smith,
 
 41,871 (La.App. 2 Cir. 1/24/07), 948 So.2d 386,
 
 writ not considered,
 
 07-0621 (La.4/20/07), 954 So.2d 149,
 
 reconsideration denied,
 
 07-0621 (La.6/22/07), 959 So.2d 485 (holding that five-year-old child was not required to visit in prison the father who was convicted of murder);
 
 see also
 
 La. C.C. art. 137 (denying visitation rights to natural parent who committed felony rape through which child was conceived). The evidence in this case does not come close to meeting this standard.
 

 At trial, Dr. Pellegrin testified that there is no evidence that Ms. Palazzo-lo is dangerous or a threat to others. Dr. Jordan likewise acknowledged that he never found any fault in Ms. Palazzolo’s interaction or visitation with I.P. Dr. Jordan’s primary reasons for recommending visitation with Ms. Palazzolo be terminated were the lack of maternal bonding and LP.’s preference to not have contact with |b3Ms. Palazzolo. Dr. Jordan acknowledged that a child being exposed to different parenting styles or techniques is not a basis for terminating the child’s contact with a parent. He also acknowledged that even in high conflict divorce cases involving heterosexual parties, absent evidence of physical or sexual abuse, he does not recommend termination of parental contact.
 

 In response to whether any harm, emotional or otherwise, would occur to I.P. if she was forced to continue visitation with Ms. Palazzolo, Dr. Jordan testified that there has been a tremendous amount of stress on I.P. and that mandating visitation continue would increase the child’s stress level. He questioned the wisdom of continuing visitation that the child did not desire to participate in and opined it was not in the child’s best interest to continue the visitation at this time. He analogized forcing visitation on I.P. to requiring her to eat carrots assuming she does not like carrots. He stated that the result is the child probably will not like carrots for the rest of her life. He opined that forcing her to go to visitation would only make I.P. more resentful and would not be in the best interest of any future relationship.
 

 We recognize the apparent frustration of the trial judge in his attempt to resolve an obviously bitter custody dispute. However, given that neither Dr. Pellegrin nor Dr. Jordan voiced any concern that would warrant denying visitation rights to Ms. Palaz-zolo and that there was no other evidence of abuse warranting denying such rights, we conclude the trial court erred in terminating Ms. Palazzolo’s visitation rights.
 

 Although we reverse the termination of Ms. Palazzolo’s visitation rights, we cannot determine from the record on appeal the
 
 *779
 
 parameters of the visitation with I.P. that Ms. Palazzolo should be granted. In order to make that determination, the |a4trial court will need to conduct an additional evidentiary hearing. On remand, we strongly recommend to the trial court that it consider appointing a parenting coordinator pursuant to La. R.S. 9:358.1-9:358.9.
 

 PARENTING COORDINATOR
 

 In 2007, the Legislature enacted the Parenting Coordination Act, La. R.S. 9:358.1-9:358.9, to address high-conflict cases such as the instant one. The purpose behind this Act is explained in the comments, which state:
 

 Parenting coordination is a child-focused alternate dispute resolution process in which a duly qualified parenting coordinator assists parents or persons exercising parental authority to implement a parenting plan by facilitating the resolution of their disputes in a timely manner and by reducing their child-related conflict so that the children may be protected from the impact of that conflict. The parenting coordinator assists the parties in promoting the best interests of the children by reducing or eliminating child-related conflict through the use of the parenting coordination process.
 

 La. R.S. 9:358.1, Comment (a).
 

 In order for the court to appoint a parenting coordinator on its own motion or on the motion of a party, good cause must be shown. For this purpose “good cause” has been defined to include the following: (i) a determination by the court that either or both parties have demonstrated an inability or unwillingness to collaboratively make parenting decisions without assistance of others or insistence of the court; (ii) an inability or unwillingness to comply with parenting agreements and orders, (iii) a determination by the court that either or both parties have demonstrated an ongoing pattern of unnecessary litigation, (iv) a refusal to communicate or difficulty in communicating about and cooperation in the care of the children, and (v) a refusal to acknowledge the right of each party to have and maintain a continuing relationship with the children. La. R.S. 9:358.1, Comment (c). We note that several of these factors are present in this case.
 

 IssThe authority and duties of a parenting coordinator are statutorily defined as follows:
 

 A. A parenting coordinator shall assist the parties in resolving disputes and in reaching agreements regarding children in their care including, but not limited to, the following types of issues:
 

 (1) Minor changes or clarifications of access schedules from the existing custody plan.
 

 (2) Exchanges of the children including date, time, place, means of transportation, and the transporter.
 

 (3) Health care management including medical, dental, orthodontic, and vision care.
 

 (4) Child-rearing issues.
 

 (5) Psychotherapy or other mental health care including substance abuse or mental health assessment or counseling for the children.
 

 (6) Psychological testing or other assessments of the children.
 

 (7) Education or daycare including school choice, tutoring, summer school, participation in special education testing and programs, or other educational decisions.
 

 (8) Enrichment and extracurricular activities including camps and jobs.
 

 (9) Religious observances and education.
 

 (10) Children’s travel and passport arrangements.
 

 
 *780
 
 (11) Clothing, equipment, and personal possessions of the children.
 

 (12) Communication between the parties about the children.
 

 (13) Means of communication by a party with the children when they are not in that party’s care.
 

 (14) Alteration of appearance of the children including hairstyle and ear and body piercing.
 

 (15) Role of and contact with significant others and extended families.
 

 (16) Substance abuse assessment or testing of either or both parties or the child, including access to results.
 

 | ss(17) Parenting classes or referral for other services of either or both parties.
 

 B. A parenting coordinator shall:
 

 (1) Refrain from facilitating an agreement by the parties that would change legal custody from one party to the other or that would change the physical custody or visitation schedule in a way that may result in a change in child support.
 

 (2) Notify the court of a conflict of interest of the parenting coordinator.
 

 (3) Prepare interim and final reports as ordered by the court and other reports when necessary.
 

 C. When the parties are unable to reach an agreement, the parenting coordinator may make a recommendation in a report to the court for resolution of the dispute.
 

 La. R.S. 9:358.4.
 

 The qualifications of a parenting coordinator are likewise statutorily defined in La. R.S. 9:358.3.
 

 The trial court has recognized that it cannot micromanage the many issues related to the parenting of this child and the length of time required for resolution of such issues through the courts. Ms. Mire and Ms. Palazzolo are two intelligent women who were in a long term relationship when they decided to become parents. It is obvious that they both care very deeply for I.P., and neither would harm her intentionally. Their personal relationship has ended, but their responsibility as parents has not. It is hoped that they will put animosity and self-interest aside and truly consider the best interest of their child. It will not be an easy task, but they have the resources to do so; the question is, do they have the will.
 

 J¿¡DECREE
 

 For the forgoing reasons, the judgment of the trial court awarding sole custody to Ms. Mire is affirmed. The judgment of the trial court terminating Ms. Palazzolo’s visitation rights is reversed. This matter is remanded to the trial court for a hearing to determine the parameters of the visitation to which Ms. Palazzolo is entitled.
 

 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 

 McKAY, J., concurs in the result.
 

 [1]
 

 . I.P. was born in January 1997. At the time of trial, I.P. was nine years old. At the time this case was on appeal, I.P. was eleven years old.
 

 [2]
 

 . According to Ms. Palazzolo, she recommended on several occasions that I.P. receive
 
 *752
 
 counseling, but Ms. Mire rejected this suggestion.
 

 [3]
 

 . When Hurricane Katrina struck, Ms. Mire and I.P. were living in Jefferson Parish.
 

 [4]
 

 . Also on that same date, the court ordered the record of the proceeding be sealed.
 
 See
 
 La. C.C. art. 135 (providing that "[a] custody hearing may be closed to the public.”) At oral argument before this court, Ms. Palazzo-lo’s counsel made an oral motion to close the proceeding on appeal to the public, which the court denied.
 

 [5]
 

 . The record reflects that Ms. Mire as a child was molested (when she was nine years old)
 
 *757
 
 and raped by her sister's boyfriend (when she was eleven years old).
 

 [6]
 

 . On October 19, 2006, Ms. Mire's rule for temporary suspension of visitation pending the court’s final ruling on the issue of custody and visitation was heard. At that hearing, Dr. Jordan and I.P. testified. Additional testimony on this rule was taken on November 7, 2006. On that date, Ms. Palazzolo presented the testimony of Dr. Jeffery J. Lockman. At the end of this hearing, the trial court determined that the interests of the parties would be best served by ruling only once on the issue of custody and visitation. The court noted its belief that if it were to negate visitation, then it would in effect be ruling on custody.
 

 [7]
 

 . Dr. Jordan acknowledged that the history a parent provides in a custody dispute may not be historically accurate. Dr. Jordan also acknowledged that age two to five is an important time in terms of a child developing attachment to a parental figure, but he stated that he doubted that it would have helped to talk to the teachers and director at UMS who saw I.P. during those years.
 

 [8]
 

 . As part of the evaluation, Dr. Jordan reviewed the notes of Dr. O'Neill, the counselor who the parties saw in the summer of 2004. According to Dr. O’Neill, neither parent raised any major complaints about the other’s parenting during the first six years of I.P.'s life.
 

 [9]
 

 . Dr. Jordan testified that he saw no need to evaluate Mrs. Posin because there were no complaints regarding her interacting or parenting I.P.
 

 [10]
 

 . Dr. Pellegrin testified that she was in tire process of writing a paper on parental alienation and that she therefore was familiar with the current research on that topic. The concept of parental alienation is discussed in detail elsewhere in this opinion.
 

 [11]
 

 . Dr. Pellegrin faulted Dr. Jordan for failing to take into account the non-tradilional nature of this family, stating in her report:
 

 The fact that the family consisted of two women does not change the fact that Angie Palazzolo is an equal parent, making June Mire's behavior no different from that of mothers who alienate their children from their fathers. If a mother were to express the same sentiments as Ms. Mire that a child should not have a relationship with the father and ceded that perhaps the father may function as an "alternate parent figure” should the mother see fit would appropriately be looked upon with extreme disfavor and dismay. This examiner could not help but wonder whether these issues have been lost because of the nontraditional nature of this family.
 

 [12]
 

 . Dr. Pellegrin testified that Ms. Mire denied that her perceptions of Ms. Palazzolo's role changed; rather, she indicated that she never considered Ms. Palazzolo a full, legitimate parent and had always viewed her as a backup parent who functioned through her relationship with her and had a "positional relationship.”
 

 [13]
 

 . The research focused on issues of social development, gender identity, self-esteem, and sexual orientation.
 

 [14]
 

 . Dr. Lockman acknowledged that he and his partner were raising a child together and that he was a member of a group involving children of lesbian and gay persons. He emphasized, however, that his opinions were anchored in science, psychology.
 

 [15]
 

 . Article 134 provides:
 

 The court shall consider all relevant factors in determining the best interest of the child. Such factors may include: (1) The love, affection, and other emotional ties between each party and the child. (2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child. (3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs. (4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment. (5) The permanence, as a family unit, of the existing or proposed custodial home or homes. (6) The moral fitness of each party, insofar as it affects the welfare of the child. (7) The mental and physical health of each party. (8) The home, school, and community history of the child. (9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference. (10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party. (11) The distance between the respective residences of the parties. (12) The responsibility for the care and rearing of the child previously exercised by each party.
 

 La. C.C. art. 134.
 

 [16]
 

 . As discussed subsequently, the determination of the visitation rights of a non-custodial parent is likewise governed by the best interest of the child. La. C.C. art. 136. Article 136 provides that "[a] parent not granted custody or joint custody of a child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would not be in the best interest of the child.” La. C.C. art. 136.
 

 [17]
 

 . Dr. Pellegrin testified that she does not subscribe lo PAS; rather, she evaluates a case involving a potentially alienated child by looking at all of the factors that could be contributing to the alienation. She does not presume the other parent is the sole cause.